KENNETH J. HORN AND VICKIE L. HORN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 25579-84, 36405-84, 36866-84, 7242-85.                    Filed May 10, 1988.

---

[1]Cases of the following petitioners are consolidated herewith for trial, briefing, and opinion: Louis V. Avioli and Joan I. Avioli, docket No. 36405-84; Clayton F. Callis and Sara S. Callis, docket No. 36866-84; and Norman C. Volle and Ruth M. Volle, docket No. 7242-85.

*A. Fuller Glaser, Jr.,* for the petitioners.
*Richard A. Witkowski,* for the respondent.

HAMBLEN, *Judge:* Respondent determined the following deficiencies in petitioners' 1982 Federal income taxes and additions to tax in these consolidated cases:

| Petitioner | Docket No. | Deficiency | Additions to tax | | | |
|---|---|---|---|---|---|---|
| | | | Sec.[2] 6653(a)(1) | Sec. 6653(a)(2) | Sec.[3] 6621(c) | Sec. 6661 |
| Horn | 25579-84 | $9,611 | $481.00 | (*) | - - - | $961.00 |
| Avioli | 36405-84 | 24,625 | 1,231.00 | (*) | - - - | 2,463.00 |
| Callis | 36866-84 | 12,464 | 623.20 | (*) | - - - | 1,246.40 |
| Volle | 7242-85 | 11,692 | 584.60 | (*) | (**) | 1,169.20 |

*50 percent of the interest due under sec. 6601 with respect to the portion of the underpayment attributable to negligence.

**120 percent of the interest accruing after Dec. 31, 1984, for the tax resulting from any substantial underpayment of tax attributable to tax-motivated transactions.

The issues for decision for all petitioners are whether petitioners are: (1) Entitled under sections 616, 162, 212, or any other section of the Internal Revenue Code to the deductions arising from their participation in the "Havasu Gold 1982 Tax Advantaged Gold Purchase Program" claimed as mining development expenses on the Schedules C filed with their respective 1982 Federal income tax returns; (2) liable for the additions to tax provided under sections 6653(a)(1) and 6653(a)(2); and (3) liable for the addition to tax provided under section 6661. As for petitioners Norman and Ruth Volle, we must also determine whether the Volles are subject to the provisions of section 6621(c).

---

[2] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.

[3] The statutory notice of deficiency refers to sec. 6621(d). This section has been redesignated as sec. 6621(c), effective Jan. 1, 1987, by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2744. For simplicity purposes, we will hereinafter refer to this section as sec. 6621(c).

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of fact and attached exhibits are incorporated herein by this reference.

Petitioners resided in St. Louis, Missouri, at the time they filed their respective petitions with this Court.

Petitioners[4] participated in a gold mine program in 1982 entitled the "Havasu Gold 1982 Tax Advantaged Gold Purchase Program" ("Lake Havasu gold mine program" or "the program"). The amount of their cash investment and the face value of the note they entered into pertaining to this program, the cubic yards aggregate purchased and bonus yards, if any, received, the date the purchase agreement was executed, and the date the bill of sale was executed, are as follows:

| Petitioners | Investment cash/note | Cubic yards aggregate/ bonus yards | Date of purchase agreement | Date of bill of sale |
|---|---|---|---|---|
| Horn | $5,000/20,000 | $4,000/0 | 12/17/82 | 1/20/83 |
| Avioli | 10,000/40,000 | 8,000/4,000 | 6/23/82 | 7/16/82 |
| Callis | 5,000/20,000 | 4,000/2,000 | 11/27/82 | 12/15/82 |
| Volle | 5,000/20,000 | 4,000/2,000 | 6/14/82 | 6/25/82 |

### The Lake Havasu Gold Mine Program Promotion

The Lake Havasu gold mine program was promoted by Henri Berger (Berger) through the Calzone Mining Co., Inc. (Calzone).

Calzone originally was incorporated in the State of California on October 20, 1981. The officers and directors of the California corporation were Berger, Guy Chastenet (Chastenet), and Audrey Lee Berger. Sometime subsequent to October 20, 1981, and apparently before November 18, 1981, this company was dissolved. On November 18, 1981, Calzone was reincorporated in the State of Nevada. The board of directors consisted of Berger, Chastenet, and Albert Sheppard. According to the articles of incorporation for the State of Nevada, the business to be conducted by Calzone was developing mine claims.

---

[4]Hereinafter references jointly to "petitioners" are to Kenneth J. Horn (Horn), Louis V. Avioli (Avioli), Clayton F. Callis (Callis), and Norman C. Volle (Volle). Each respective spouse of these petitioners is participating in the respective case because she filed a joint Federal income tax return with her husband.

Petitioners subpoened Berger to testify at the trial. According to Berger, he received a "pre-med" (dental) degree from a college in France. Subsequently, in 1957 or 1958, he graduated from Tufts University in Boston, Massachusetts, with a degree in dentistry. Following his graduation, Berger entered into the cosmetic business with his wife. He was engaged in that business for approximately 6 to 8 years. Following that, Berger was involved in marketing and sales of real estate for a number of years. In 1977, he left this work and began to sell computer portrait T-shirts and computer portrait equipment. Berger had a store in California for about 3 years and sold both of these items.

In 1978, Berger and a business associate by the name of Honsucker acquired some mining claims on property in Utah owned by the Bureau of Land Management (BLM) and leased to Honsucker. They hoped to mine oil shale on these claims. These mining claims subsequently were abandoned because Berger and Honsucker could not raise the money needed to mine the property.

Berger was introduced to Chastenet in 1979 by Robert MacDonald (MacDonald). MacDonald owned an engineering company in New York.[5] He recommended Chastenet to Berger when Berger mentioned that he was looking for an engineer to look at a piece of property in Utah. This property was the Utah mining claims owned by Berger and Honsucker. Chastenet, however, advised Berger that it would be too costly to mine this property.

Berger first heard of the Lake Havasu region in the summer of 1981 from Allen Russell (Russell).[6] Russell referred Berger to John Pasak (Pasak). Pasak had mined in the Lake Havasu region for a number of years. Claims purportedly owned by Pasak were the claims that Berger promoted as the Lake Havasu gold mine program. Berger was told by Russell to contact a Mr. Needles. (Needles)[7]

---

[5]This company purportedly was the general contractor for the construction of the St. Louis Gateway Arch.

[6]Russell purportedly was a promoter of the Cape Yakataga gold mine venture. See note 11 *infra* about that venture.

[7]The record does not explain the relationship between Needles and Pasak or Russell or Berger.

In September 1981, Berger met with Pasak, Needles, a Mr. O'Brien (O'Brien), Rick Carling (Carling), and David McLlellan, (McLlellan) in Las Vegas, Nevada.[8] McLlellan, an attorney, was hired by Berger in early 1981. At the meeting in September 1981, O'Brien allegedly gave Berger an assay report, a BLM report, history of the area, and various backup materials regarding the mine. Berger then purportedly gave these documents to McLlellan for McLlellan's review. A few weeks later, Berger visited the mine site.

Berger testified that he asked Chastenet to come to the Lake Havasu area in October or November 1981 to find out if Chastenet would like to work for them. Around this time, Chastenet also was elected to a position on the board of directors of Calzone and was made a vice president of the company. Later, purportedly after conferring with MacDonald, Chastenet allegedly informed Berger that it was against company policy for Chastenet to become involved personally and that Calzone, instead, should retain MacDonald Gateway Engineering (Canada), Ltd. (MacDonald Gateway). Chastenet was the executive vice president of MacDonald Gateway. Chastenet purportedly then resigned as director and vice president of Calzone.

Calzone allegedly retained MacDonald Gateway to do all the engineering and mining for the Lake Havasu gold mine for a fixed fee plus all costs. Calzone allegedly requested that Chastenet or MacDonald Gateway do a feasibility study regarding the Lake Havasu gold mine. Chastenet purportedly drilled a number of test holes on the property for this purpose. Chastenet did not testify at the trial nor did Michael Lipstate, the individual hired as chief engineer for Calzone after Chastenet left the program.

Calzone originally advertised the sale of units at the Lake Havasu gold mine through a booklet entitled "1981 Rick-Mine Arizona," dated October 23, 1981. The title "Calzone Mining Company, Inc. Gold For Your Tax Advantage" (the "1981 program") also was used for the 1981 program. The

---

[8]O'Brien was an attorney representing Pasak, Needles, and Carling. McLlellan apparently had been involved in some manner with the Cape Yakataga gold mine venture before joining Berger. See note 11.

booklet indicated that Rick-Mine Development Corp. (Rick-Mine) owned certain mineral leases on land owned in fee by the United States and located in Mohave County, Arizona, and was neither owned nor controlled, directly or indirectly, by the same interests as Calzone. These mineral leases were the same claims purportedly owned by Pasak. Rick-Mine allegedly held the mineral rights in a trust capacity for Pasak. Carling was the president of Rick-Mine.[9] The record does not show if any units were sold under the 1981 program.

During the 1982 calendar year, Calzone created and published a booklet entitled "Havasu Gold-1982-Tax Advantaged Gold Purchase Program" (the "1982 offering circular"). The 1982 offering circular was drafted by Berger and McLlellan. During 1982, Calzone distributed its 1982 offering circular to various brokers and salesmen. Calzone paid the brokers and salesmen a commission for each sale. During the 1982 taxable year, Calzone offered incentives to both salesmen and purchasers to increase sales volume.

The 1982 offering circular offered a purchaser the opportunity to purchase for $400 all of the gold that may be found in 8,000 cubic yards of mineral aggregate. One-half units of 4,000 cubic yards were also available, with the purchaser paying the sum of $200 for such gold. The purchaser of the gold was required to pay to Rick-Mine, as the balance of the purchase price, an override (royalty) of 50 percent of the total gold mined from the purchaser's mineral aggregate, after deduction of all development, interest, mining, and extraction costs.

According to the 1982 offering circular, the purchaser was to designate the mining company to perform the development work and the actual mining, or pay a bond and perform the work himself. Three potential mining companies were listed in the 1982 offering circular. The first company so listed was Calzone. A section of the circular described Calzone, Berger, MacDonald Gateway, and Chastenet, and, among other things, stated that "inasmuch as Calzone Mining Company, Inc. has arranged for financing to qualified purchasers wishing to finance the development costs of his Unit(s), the Mine Owner has agreed to allow Calzone to

---

[9]Neither Pasak nor Carling testified at the trial.

establish mining and development facilities on the mining site."

A substantial portion of the 1982 offering circular was devoted to the alleged tax advantages of the Lake Havasu gold mine program. Among other things, the 1982 offering circular stated that: "The tax writeoff for 1982 can be as much as five (5) times the original cash outlay. By financing a substantial portion of the development costs the Purchaser 'leverages' his assets and obtains this significant writeoff." It also contained a series of questions and answers that emphasized the five-to-one tax writeoff and explained how the writeoff was derived. A chart was provided entitled "Examples of Tax Advantaged Purchases" which demonstrated how the five-to-one ratio was calculated.

The 1982 offering circular also contained a tax opinion letter dated February 25, 1982, signed by John A. Woodward, and addressed to Berger. Among other things, this letter indicated that it did not address the personal tax situation of any purchaser. The tax-opinion letter cautioned that the program had certain characteristics of a "tax shelter" which could subject the purchase to additional scrutiny by the Internal Revenue Service. The letter concluded as follows:

It is critical that the Purchaser be deemed to be engaged in the trade or business of mining operation to assure deductibility of expenses incurred. A "trade or business" has been defined by IRS Publication 344 as "a pursuit carried on for livelihood or for profit. For a pursuit to be recognized as a business, a profit motive must be present and some type of economic activity must be involved." Therefore, a purchaser must carry on the activity with a businesslike attitude, use of business expertise, sufficient effort and generally pursue the transaction diligently. This is a very subjective test and can be met in a number of different ways. It is, however, clear that should a purchaser fail to meet the trade or business test the deduction discussed above would be disallowed.

The foregoing discussion is limited to the issues raised herein. Other issues may be present which have not been addressed. Again, each purchaser is encouraged to consult with his or her own tax advisor with respect to this transaction and the tax circumstances to that person.

In addition, the 1982 offering circular contained a tax defense letter from Calzone signed by Berger. This letter stated as follows:

To Whom It May Concern:

RE: Tax Defense Letter

This letter will serve to constitute notice that Calzone Mining Company, Inc. hereby undertakes to place funds in a separate tax-defense reserve account.

Said funds shall be available to provide independent legal representation in the event that the Internal Revenue Service should take a position adverse to the anticipated tax benefits associated with this purchase program, by use of the optional full recourse promissory note.

This undertaking shall cover the judicial district of the first such case in which the Internal Revenue Service takes an adverse position. The scope of the legal representation shall include representation in the U.S. Tax Court and U.S. Supreme Court, if necessary.

A sample completed Schedule C showing how to report for tax purposes the deduction for mining development expenses was also included in the 1982 offering circular.

The 1982 offering circular also included a computation of "Estimated Income Potential." Using an estimated value of $35 in gold per cubic yard, the computation estimated income of $97,400 from a $50,000 investment.[10] The $35 value for the gold purportedly was based on assay reports and an engineering survey contained in the 1982 offering circular. The purported engineering survey was contained in a "Feasibility Study of the Quail Placer Mining Claims located in Mohave County, Arizona" (the "feasibility study") prepared by Chastenet. The feasibility study was based on five random samples purportedly representative of the proposed area. It cautioned, however, that the evaluation was only an estimate and was based on incomplete information. The feasibility study does not state that there is an average of $35 per cubic yard of mineral aggregate on

---

[10]This computation is as follows:

| | | |
|---|---:|---:|
| Estimated gold value: | | |
| 8,000 cubic yards at $35.00 per cubic yard............................. | | $280,000 |
| Deduct: | | |
| Cash downpayment ............................... | $10,000 | |
| Note ........................................... | 40,000 | |
| Interest (estimated 4 years)....................... | 19,200 | |
| Gold extraction (processed) ....................... | 16,000 | 85,200 |
| | | 194,800 |
| Deduct: | | |
| Override (royalty) — 50% Rick-Mine Development | | |
| Corp ........................................ | 97,400 | |
| Estimated income in gold bullion ................. | | 97,400 |

the whole property. The data contained in the feasibility study is insufficient to disclose the existence of ores or minerals at the mining site in commercially marketable quantities.

The 1982 offering circular also contained a section on risks which stated as follows:

RISKS AND OTHER IMPORTANT FACTORS

An individual contemplating a purchase of the gold content in a Unit of aggregate should give careful consideration to the risks involved in a gold and mineral mining operation, including but not limited to, those summarized below:

1. *Lack of Registration.* The tax advantaged purchase opportunity described herein has not been registered with the Securities and Exchange Commission nor with the securities commission of any state, in reliance upon an opinion of qualified counsel that the purchase opportunity does not constitute a security under applicable federal and state securities laws. Thus, there is no requirement that this purchase opportunity comply with governmental standards for securities offerings. A Purchaser, therefore, does not have the benefit of having had the purchase opportunity reviewed by the Securities and Exchange Commission or any state regulatory agency. Further, because the securities laws are subject to interpretations which may not necessarily agree with the securities opinion being relied upon, it is possible that securities regulatory agencies could assert jurisdiction and order the program to cease or impose sanctions or both.

2. *Mining Risk.* Mining involves a high degree of risk of loss. There can be no assurance that the mining activity on behalf of the purchasers will obtain commercially exploitable gold or that the purchasers will recoup all or any part of their monies. No combination of experience, knowledge and scientific evaluation can overcome the risks of investment so as to assume a profit to the purchaser. Accordingly, the purchase of the gold content contained in the aggregate should be considered only by those persons whose incomes are such that they can bear the risk of loss, are subject to recurring federal income tax at high rates and who would, therefore, benefit most from the treatment given such investments under present federal tax laws.

3. *Governmental Regulation of Mining.* Mining operations are at times subject to significant governmental regulation which may adversely affect the ability to mine the gold aggregate claims as intended. Both the state where the claims are located as well as the Bureau of Land Management and other agencies, including securities and tax authorities may assert jurisdiction and take action which could be detrimental to the purchasers and/or necessitate revisions and changes in the plan of operation.

4. *Tax Risks.* It is anticipated that there will be substantial federal income tax advantages incident to the purchase opportunity presented

herein. (See "Tax Opinion"). The federal income tax consequences are discussed in more detail under the Questions and Answers section and the Tax Opinion included elsewhere herein. Whether these anticipated advantages will be realized by the purchasers is subject to various risks which are discussed in the Tax Opinion.

The 1982 offering circular also contained sample blank copies of a purchaser qualification questionnaire, purchaser's representative questionnaire, purchase agreement, designation of development method, and bill of sale. Furthermore, the circular contained blank copies of optional mining and development documents to be used if Calzone was elected as the purchaser's mining company, consisting of a mining and development agreement, full recourse promissory note, and assignment.

Also contained within the circular was a securities opinion dated February 15, 1982, and signed by James Geffner.

Each of the units purchased was specifically identified in a bill of sale and referenced to a grid map contained in the 1982 offering circular. The specific location on the grid map was designated by Calzone, and a purchaser did not have the option of choosing where his mine was to be located. One full unit of 8,000 cubic yards encompassed a designated area of land 20 yards square by 20 yards deep. As part of a sales incentive, some purchasers who acted timely received bonus amounts of cubic yards of aggregate from the mine owner, without any obligation to pay Calzone a fee for the development of the additional aggregate. The bill of sale evidencing the location of the purchaser's mine and quantity of the cubic yards purchased was executed by Carling who recorded the bill of sale at the Mohave County Court House.

Each of the petitioners entered into a mining and development agreement with Calzone wherein Calzone was retained to develop, for the total sum of $50,000 for a whole unit and $25,000 for a one-half unit, the cubic yards of mineral aggregate purchased. The purchasers paid $5,000 in cash for each one-half unit and $10,000 for each whole unit, and signed a promissory note in favor of Alpha Interchanges Corp. (Alpha Interchanges) in the amount of $20,000 for a one-half unit and $40,000 for a whole unit.

Pursuant to the mining agreement, Calzone was to complete substantially all development of the taxpayers' aggregate within 12 months. All mining operations were to be completed in not more than 6 years. Under the mining agreement, Calzone was to be paid, out of production, $2 per cubic yard processed to cover mining costs.

The promissory notes executed by petitioners provided that the principal would be due and payable 7 years after the date of execution of the note and would bear simple interest at the rate of 12 percent per year, payable annually in arrears. The note referenced and incorporated the terms and conditions of the "Mining and Development Agreement" between the maker and "Lender" (Calzone), and made no provision for default in payment of interest. These notes were placed by Calzone through Alpha Interchanges in a restricted account in a bank known as Interbank, Ltd. (Interbank). Sometime in 1982 or 1983, Interbank changed its name to International Bank & Trust Corp., Ltd.

Alpha Interchanges was a financial brokerage company. Pursuant to its agreement with Calzone, dated March 1, 1982, Alpha Interchanges agreed to act as broker for Calzone pertaining to these promissory notes. Accordingly, Alpha Interchanges agreed to find funds for Calzone by either using the notes as collateral or discounting them to another party, in exchange for a commission of 1 percent of the total face value of any notes involved in the transaction. Alpha Interchanges never provided funds for the promissory notes. The record does not show what relationship, if any, Calzone or Berger had with Alpha Interchanges.

Interbank was an investment bank registered in Great Britian, and incorporated and trading as a bank on the Island of Antigua as of February 19, 1979. Pursuant to a service agreement between Alpha Interchanges and Interbank executed in London on June 24, 1982, and stated to be effective as of November 5, 1981, Interbank agreed to credit Calzone's restricted account with the face value of each note assigned to the bank and issue a deposit receipt to Calzone with the note maker's specific reference number thereon in the amount of the note. However, it was further agreed by the parties that the account did not entitle Calzone or any other party to withdraw any funds from the

account except, and only to the extent, that Calzone or the party deposited gold bullion or other legal tender or collateral accepted by the bank, or as otherwise approved in writing by the bank. Gold bullion or other legal tender or collateral was never deposited into this account, and funds were never withdrawn.

Calzone opened a non-interest-bearing account with Interbank on June 28, 1982. Calzone used this account to deposit and withdraw promissory notes. The account was closed on October 24, 1983. At that time, the stated value of the promissory notes withdrawn (in U.S. dollars) was $10,829,600.

Calzone also maintained a separate account at Interbank to collect interest from the promissory notes. This interest account was opened on January 3, 1983, and as of October 13, 1984, was still maintained at that bank.

All purchasers received a forgiveness of interest on their promissory notes for the 1982 taxable year. During 1983, some of the purchasers were contacted by a representative of Interbank requesting the payment of interest as required under the promissory note. Some purchasers did pay, as requested, the amount designated as interest. Purchasers contacted by Interbank to pay interest on their notes were instructed to send the payments to Interbank's account at a bank in Dallas, Texas. These payments subsequently were credited to Calzone's account with Interbank.

Interbank held the promissory notes as a fiduciary for Calzone. The interest which was collected was disbursed to Calzone. Calzone had complete control over the promissory notes and the interest collected on those notes. The promissory notes executed by the purchasers would have been difficult to fund in the ordinary course of business because there was a lack of security behind the notes, the interest rate was fixed, and the notes and interest were payable only in U.S. dollars.

Sometime in 1983, Calzone instructed Interbank to transfer the promissory notes to a London solicitor by the name of F.D. Sachs (Sachs). Sachs received these notes on October 25, 1983. Sachs did not testify at trial and the record does not show what relationship, if any, he had with Berger or Calzone.

In April 1982, Calzone was advised by the Securities and Exchange Commission (SEC) that the SEC was conducting a formal investigation of Calzone. Based on its investigation, the SEC determined that promotion of the Lake Havasu gold mine program involved the sale of a security. Berger and Calzone subsequently entered into a consent with the SEC not to participate any further in this promotion or a similar promotion.

Calzone filed a voluntary petition in the U.S. Bankruptcy Court for the Central District of California on April 4, 1984, seeking relief under chapter 7 of the Bankruptcy Code. On the schedules submitted by Calzone pertaining to its bankruptcy, Calzone listed an asset of unknown value identified as follows: "65 percent contingent interest in balance of monies collected by holder in due course of outstanding notes: TRENBANS INVESTMENT LIMITED (Trenbans), 35 Trevor Square, London SW7 1DY Evidenced by written agreement." Trenbans was a company owned by Lewis Rowe (Rowe). Rowe was vice president of the international division of Interbank from 1981 through March 1984. Trenbans had no relationship to Interbank, although Rowe was at some time vice president of Interbank. The record does not show what relationship, if any, Rowe or Trenbans had with Calzone or Berger. The record does not show whether these outstanding notes were the promissory notes transferred to Sachs and, if they were, how Trenbans acquired them. The schedules also identified as an asset mineral rights of nominal value.

On July 17, 1984, the trustee in bankruptcy of the Estate of Calzone, Max Rush (Rush), filed a notice of trustee's intent to abandon property, listing the above identified 65-percent contingent interest. Rush represented that efforts to collect these notes were burdensome and, accordingly, he intended to abandon all interest in the notes. Subsequently, in a letter dated April 12, 1985, Rush stated that no assets had been abandoned at that time and that he had no present intention of abandoning assets, as he had been requested by representatives of the Federal Government not to abandon assets. As of the date of trial, no action had been taken with respect to Calzone's bankruptcy petition.

In August 1984, petitioners received correspondence from Trenbans offering to sell petitioners' promissory notes to them for 7½ percent of the notes' face value plus $200 for expenses. For a $40,000 note, the amount requested by Trenbans would be equal to $500.

From November of 1981 through December 31, 1982, approximately 330 purchases of mining sites were made. Cash payments to Calzone totaled $3,454,393 for the period beginning November 1981 through June 1983, and Calzone paid $1,349,222 in commissions on the sales of the 330 units. "Recourse" notes for the same period totaled $13,817,572. The potential mining and development expense deductions the 330 purchasers may have claimed on their returns was the sum of the cash and notes, or $17,271,965.

During the 1982 calendar year, the price of gold per ounce on the commodities market ranged from a low of $296 in June, to a high of $486 in September.

### Petitioners and Their Involvement in the Program

#### 1. *Horn*

Horn attended college for 3 years, majoring in business administration. After leaving college, he worked for various retail grocery chains and retail food brokers until he started his own business in March 1977. This business is an institutional food brokerage company which sells foods to restaurants, schools, various other institutions, and delicatessens.

Horn first heard of the Lake Havasu gold mine program in the fall of 1982 from his accountant, George Dickherber (Dickherber). Horn had approached Dickherber about possible investments, and Dickherber mentioned the Lake Havasu gold mine program as a possible investment and shelter of taxes. Dickherber gave Horn the 1982 offering circular which Horn read.

Horn testified, at the trial, that he purchased 8,000 cubic yards of ground pursuant to this gold mine program. Horn also testified that he paid $10,000 to Calzone, signed a promissory note for $40,000, and paid $400 to Rick-Mine. On cross-examination, it was established that Horn actually had purchased 4,000 cubic yards of aggregate, paid $5,000

to Calzone and $200 to Rick-Mine, and signed a $20,000 promissory note. He never visited the mine site.

Horn never paid any interest on the promissory note. According to Horn, he did not pay interest because he never received any notice of interest due. At the time of trial, the location of this note was unknown.

According to Horn, it was his understanding that "Rick Mining" was going to do the actual mining, that Calzone had the rights to the property, and that Calzone had hired "Rick Mining" Co. to do the actual mining. However, Horn did not know what the payment to Rick-Mine was for. Further, Horn was not sure what documents, in addition to the promissory note, he had signed in connection with the Lake Havasu gold mine program.

Horn had no prior experience in mining, nor had he contemplated becoming a gold miner prior to his decision to participate in the Lake Havasu gold mine program. He had no independent knowledge of how a mining company operated and made no attempt to learn. According to Horn, he was not aware that Dickherber would receive a commission on the sale of Horn's unit.

Horn made no independent analysis of the data contained in the 1982 offering circular, nor did he take the documents to an independent mining engineer, geologist, or tax attorney for an analysis. Horn made no attempt to verify any of the information contained in the 1982 offering circular.

Horn did not contact any of the other mining companies listed in the 1982 offering circular or any other mining company to find out what another company would have charged him to develop or mine the site. According to Horn, he relied on Dickherber for the determination that the amount charged by Calzone was reasonable for the development of his mine site. Dickherber never represented to Horn that he had any prior experience in mining.

Horn had no idea how the gold would be processed. He did not know whether he would have to incur any cost to have the gold turned into gold bars or if other refining might be needed. After Calzone went into bankruptcy, Horn made no attempt to discover what needed to be done to preserve his interest in the property nor did he investigate the possibility of bringing in another mining company to

mine gold on his property. Horn had invested in various oil and gas well ventures in earlier years.

### 2. *Avioli*

Avioli, an internist specializing in endocrinology, received his medical training from Yale School of Medicine. At the time of trial, he was a professor of medicine at the Washington University School of Medicine.

Avioli first heard of the Lake Havasu Gold mine program from his financial advisor, Emil Wachter (Wachter), in January or February of 1982. According to Avioli, the mine was located in Texas, and he looked basically at "the bottom line." He did not review the 1982 offering circular in detail. He received a tax calculation from his accountant, Bernard Eder (Eder) with respect to the potential investment in the Lake Havasu gold mine program.

Avioli did not consult with anyone independent of Wachter or Eder with respect to the Lake Havasu gold mine program. He did not investigate the possibility of bringing in another mining company to develop the mine.

Avioli paid $2,282.22 on August 1, 1983, to Barton E. Shapkin, in trust for International Bank & Trust Co., as purported interest on the promissory note he executed in 1982. Avioli purchased other tax shelter programs from Wachter in earlier years.

### 3. *Callis*

Callis received an undergraduate degree in chemistry, a master's of science degree in chemistry, and a doctor's of philosophy degree in inorganic chemistry. He completed his formal education in 1948. After completing his education, Callis worked for 3 years in the nuclear field. His work pertained to the production of plutonium. Thereafter, he worked for the Monsanto Co. for more than 34 years, retiring in 1985 as its director of environmental operations. At the time of trial, Callis was on the board of directors of the American Chemical Society. He also was on the boards of two colleges and was a member of the Science Advisory Board of the Environmental Protection Agency, Executive Committee.

Callis first heard of the Lake Havasu gold mine program from Wachter. Callis previously had been referred to Wachter by Eder, his accountant. Callis had invested in some real estate partnerships in earlier years through Wachter. Callis asked Eder for more information about the Lake Havasu gold mine program.

Callis read the 1982 offering circular for the Lake Havasu gold mine program but did not seek independent advice regarding the program. According to Callis, he assumed the program was honest because "somebody can't write a pack of lies this thick and get away with it in this country." Callis knew nothing about mining or mining technology and had no prior background in mining. He assumed that Wachter would receive a commission from his investment in the Lake Havasu gold mine program.

Callis made no attempt to investigate the qualifications of Calzone. He did not contact any of the other mining companies listed in the 1982 offering circular. He made no independent analysis of the amount charged by Calzone for development of the mine to determine its reasonableness. According to Callis, he accepted the charge as being "part of the package." Callis did not know what services he would be receiving for the money. He made no independent analysis of the data contained in the 1982 offering circular, nor did he take the documents to an independent mining engineer, geologist, or tax attorney for an analysis. Callis made no attempt to verify the information contained in the 1982 offering circular. Callis paid $2,400 in 1983 as purported interest on the promissory note he executed in 1982.

Callis did not investigate the possibility of bringing in another mining company to develop the mine after Calzone filed its bankruptcy petition.

### 4. *Volle*

Volle received an undergraduate degree in the field of business management and has a master's degree in business administration. At the time of trial, he was employed as a project manager for special projects.

Diversified Tax Services (Diversified) prepared Volle's 1982 Federal income tax return. Dickherber was one of the owners of Diversified, as was Paul Clark (Clark) and

Dickherber's brother, Francis. Volle dealt mainly with Clark at Diversified, although he did have some dealings with Dickherber.

Volle first heard of Calzone from Clark. Clark gave Volle, among other things, the 1982 offering circular for the Lake Havasu gold mine program. Clark informed Volle that Clark would receive a commission on the sale.

Volle did not have an attorney or accountant not connected with the Lake Havasu gold mine program review the materials given to him by Clark. Volle did not pay any attention to the date of Calzone's incorporation or the number of employees Calzone had. Volle did not question the qualifications of Calzone or Berger. Volle did not conduct any independent investigation of the project to determine if Calzone's charges were reasonable. Volle did not have an independent mining engineer or geologist review the materials he had received on the Lake Havasu gold mine program. At the trial, Volle could not recall the size of the plot of ground or the depth of the ground in the area he purchased.

According to Volle, in 1983 he paid interest on the promissory note he executed in 1982. Volle had invested in the Cape Yakataga gold mine venture in 1981.

### *Petitioners' Return Preparers and Financial Advisor*

### 1. *Dickherber*

Dickherber received a business school diploma in 1951. He started his own bookkeeping, accounting, and tax service business in 1967, which was incorporated into Diversified Business Services in 1969. Dickherber, his brother Francis, and Clark were the principal shareholders in this business. Tax return preparation was done by Diversified, a related corporation.

Dickherber held a license to sell securities which at some time he transferred to Titan Capital Corp. (Titan Capital). Wachter was regional representative and a vice president of Titan Capital and manager in charge of its St. Louis office. As such, he supervised Dickherber's work for Titan Capital. Wachter brought the Lake Havasu gold mine program to Dickherber's attention in February or March of 1982. Prior

to hearing of the Lake Havasu gold mine program, Dickherber had sold interests in two other gold mine projects—Cape Yakataga, in Canada (1981), and Gold for Tax Dollars, in French Guiana, South America (1980).[11]

Dickherber testified that he received commissions on the sales of interests in the Lake Havasu gold mine programs, but did not so advise an investor unless specifically asked. He did not disclose to Horn that Dickherber would get, or got, a commission on Horn's purchase of a one-half unit in the Lake Havasu gold mine program. Dickherber's partnership invested in the Lake Havasu gold mine program—its investment was $10,000, for which it bought 1 unit.

## 2. *Eder*

Eder received a degree in public administration in 1948. He is a certified public accountant, and at the time of trial, was a senior partner in the firm of Eder & Co..

Eder first heard of the Lake Havasu gold mine program from Wachter in early 1982. Wachter was a client of Eder. Wachter frequently asked Eder his professional opinion on the accounting accuracy of figures involved in Wachter's tax shelters and whether a potential program was feasible and advisable. Eder reviewed the Lake Havasu gold program for Wachter. Wachter also sent potential "investors" to Eder for tax calculations.

Eder did not personally investigate the credentials of Chastenet to determine if he was qualified as an engineer. Eder relied on the statement in the 1982 offering circular that MacDonald Gateway had been involved in the construction of the Gateway Arch in St. Louis, Missouri. Eder was not qualified to give an engineering opinion on the Lake Havasu gold mine program. He relied on the statements in the 1982 offering circular and the fact that gold mining takes place in this area of the country.

Eder's partner prepared the 1982 Federal income tax return for Callis and Avioli. After their investment in the Lake Havasu gold mine program, Callis and Avioli occasionally asked Eder questions about it. Eder testified that he

---

[11]This Court has found both of these latter projects to be fraudulent factual schemes and/or devoid of economic substance. See *Gray v. Commissioner,* 88 T.C. 1306 (1987), appeal pending (Gold For Tax Dollars), and *Dister v. Commissioner,* T.C. Memo. 1987-217 (Cape Yakataga).

first realized there was a problem with the program when Calzone filed its bankruptcy petition.

Eder was a partner in Emil Wachter & Associates, a partnership formed to invest in the Lake Havasu gold mine program. Eder did not receive a commission with respect to the sale of units in the Lake Havasu gold mine program. However, Wachter compensated Eder for the time he spent reviewing the various projects Wachter referred to him.

### 3. *Wachter*

Wachter received an undergraduate degree in philosophy and economics in 1940. He was employed as a life insurance underwriter for 24 years. In 1971, he became a registered salesman for securities. He has been with Titan Capital since 1978.

Wachter first sold gold mine programs in 1980 and learned of the Lake Havasu gold mine program in December 1981 from Jordan Potash (Potash). Wachter had done business with Potash before on the development of the Cape Yakataga gold mine program.

Sometime in late 1981, Potash allegedly sent Wachter a prospectus for the 1981 program being offered by Calzone. Potash purportedly asked Wachter to review the prospectus because Potash was considering the possibility of wholesaling the program across the United States and wanted an opinion on doing so. Wachter allegedly told Potash that he was not interested in the 1981 program because it was too late in the year and he did not have time to review the prospectus.

Wachter purportedly was approached about the 1982 Lake Havasu gold mine program in mid-January 1982. According to Wachter, he visited the mine site in February 1982 with Chastenet and Potash.[12] In April of 1982, allegedly Dickherber, Eder, and Wachter traveled to the Lake Havasu gold mine site.

Wachter received a commission of 15 percent of the cash paid on the sales of units to Callis and Avioli. He also received an override on the sales of units by Dickherber. He

---

[12]Potash was not called as a witness at the trial. The record contains no other information pertaining to Potash's involvement with the Lake Havasu gold mine program, Calzone, Berger, or Wachter.

did not receive a commission on the payment to Rick-Mine for the mineral rights or on the promissory notes.

*Proceedings Under Sections 7407 and 7408*

On April 16, 1984, pursuant to sections 7407 and 7408, the United States filed a complaint for permanent injunction and other equitable relief ("the complaint") against Wachter, Clark, Dickherber, Francis R. Dickherber, Rethcaw Corp., Midwest Capital Corp., JKR Enterprises, and Diversified (the "defendants"), seeking, among other things, to enjoin these defendants from "organizing or assisting in the organization of or selling the abusive tax shelter plan or arrangement known as 'Havasu Gold,' and from engaging in any other conduct subject to penalty under Section 6700 of the Internal Revenue Code of 1954, as amended (26 U.S.C.) (Internal Revenue Code), and from engaging in other similar conduct which substantially interferes with the proper administration of the internal revenue laws." The complaint also sought to enjoin Clark, Dickherber, Francis R. Dickherber, and Diversified from negligently or intentionally disregarding rules and regulations in the preparation of income tax returns, or willfully understating a taxpayer's tax liability, or from engaging in any fraudulent or deceptive conduct, with respect to the preparation of income tax returns, which substantially interferes with the proper administration of the internal revenue laws.

Subsequently, on January 24, 1985, the defendants, without admitting or denying any of the allegations of the complaint except as to jurisdiction, entered into consents to the entries of final judgments of permanent injunction and agreed to pay the United States a certain sum as penalties provided in sections 6694, 6700, and 6701 relating to the organization of the sale of interests in, and the preparation of, tax returns involving the "Havasu Gold" tax shelter. Final judgments of permanent injunction as to the defendants were entered on February 11, 1985. Pursuant to those judgments, the defendants were, among other things, permanently enjoined and restrained from directly or indirectly, by the use of any means or instrumentalities from:

a. Taking any action in furtherance of the organization, promotion, marketing, selling or offering for sale of the [Havasu Gold] Tax Shelter.

b. Representing that an investor in the [Havasu Gold] Tax Shelter will be entitled to deductions, for federal income tax purposes, including deductions for mine development expenditures and for interest paid or accrued on notes, and from furnishing or distributing materials, and oral or written information, which contain such representations.

The Internal Revenue Service conducted its examination of the Lake Havasu gold mine program from April 1983 through January 1984.

Charles Wayne Johnson (Johnson), testified for respondent as an expert witness. Johnson received a bachelor's degree in 1971, a master's degree in 1972, and a doctor's of philosophy degree in 1973, in industrial and general engineering. Johnson has been involved actively in the mining business since 1947. He is the owner of Johnson Engineering, which is involved primarily in the metallurgical extraction of precious metals and the processing of nonmetallic metals.

Johnson was employed by Oliver LaVato (LaVato) in May 1984 to perform some work at a mining site near Havasu City, Arizona, identified as the "Havasu Gold Placers" or the "Quail Placers." LaVato had contacted Johnson to fix a mill at the mining site. Johnson advised LaVato that he first would evaluate the property to determine if the site had anything there for the mill to catch. The mill was located on the northeast quarter of section 30, range 18 west.[13] Johnson visited the mining site on May 23, 1984, with LaVato, LaVato's son, and Pasak. Pasak had been identified to Johnson as a mining claim owner. Johnson testified that Pasak tried to give him evidence of gold on this property by running a small dry washer at three or four locations, but Pasak got only a speck of gold at one location which assayed at 3½ cents per ton. Johnson testified further that on May 24, 1984, he returned to the site with a backhoe operator and dug about 20 holes at the site with a backhoe to depths of 4 to 22 feet at locations

---

[13]The record does not show what relationship, if any, LaVato had with Calzone, Berger, or the Lake Havasu gold mine program. LaVato did not testify at the trial. We note, however, that the bills of sale issued to petitioners describe the units as being part of "that certain mining claim known as Quail #5, more particularly located and described as the North 1/2 of the East 1/2 of section 30, Range 18 West, Township 15 North, Gila and Salt River Base and Meridian."

where he hoped to find gold. The holes dug to only 4 feet in depth were holes where Johnson hit bedrock. He collected samples from these test holes. Johnson testified that he found only traces of gold in the samples. He testified further that he did not find any commercial value of gold in the test samples. Johnson did not calculate a value for any of the 20 test samples because the values were so low.

Ken A. Phillips (Phillips) also testified for respondent. At the time of trial, he was the chief engineer with the Arizona Department of Mines and Mineral Resources (the "department"). Phillips testified that in the spring of 1982, the department had received a number of inquiries from potential investors in the Lake Havasu gold mine program. In all cases, the department recommended that the potential investors hire a mining engineer prior to their committing funds to at least evaluate the data furnished. Phillips testified further that he advised potential investors that the $35-per-cubic-yard figure in the 1982 offering circular seemed "exceptionally high, unbelievable." He also advised potential investors that the testing as represented in the 1982 offering circular was totally inadequate. None of the petitioners, their tax preparers, or financial advisors made inquiries of the department pertaining to the Lake Havasu gold mine program.

Harvey W. Smith (Smith), a consulting mining engineer, also testified for respondent. Smith had been retained in late 1984 by the SEC to render an opinion with respect to the Lake Havasu gold mine program. The SEC asked Smith to determine, from the documents presented to him, if there was a viable ore body at the Lake Havasu gold mine site, if the procedures that Calzone had used to determine that viable ore body were correct and of good practice, and if an individual investor could actually mine the plot of ground that he had bought. Smith had been furnished the 1981 and 1982 offering circulars. He also visited the mine site in January 1985. Smith testified at trial that the feasibility study contained in the 1982 offering circular did not adequately show that the mineral aggregate had a value of $35 per cubic yard. He further testified that from what he saw there was insufficient information to determine the grade of the material in the ground. Smith also testified

that it would not be economically feasible to mine a plot of ground of the size involved in the Lake Havasu gold mine program.

None of the petitioners have received income from their Lake Havasu gold mine program purchase.

On the Schedules C filed with their 1982 Federal income tax returns, petitioners claimed under section 616 the following mining-loss development expenses from their participation in the Lake Havasu Gold mine program:

| Petitioner | Docket No. | Loss claimed |
|------------|------------|--------------|
| Horn | 25579-84 | $25,200 |
| Avioli | 36404-84 | 50;200 |
| Callis | 36866-84 | 25,200 |
| Volle | 7242-84 | 25,200 |

The petitioners' Schedules C, mining businesses, were on the cash receipts and disbursements method of accounting.

Respondent disallowed all of the losses petitioners claimed pertaining to their participation in the Lake Havasu gold mine program.

Berger, Wachter, Eder, and Dickherber were not credible witnesses.

The record does not establish that there are commercially marketable quantities of gold within the petitioners' individual mining claims.

### ULTIMATE FINDINGS OF FACT

The Lake Havasu gold mine program was an abusive tax shelter, a sham transaction, devoid of any economic substance. The "full recourse promissory notes" involved in this case were shams.

### OPINION

This consolidated case is serving as a test case for other petitioners whose cases before this Court are being held in abeyance pending our decision here.

All of the disputed deficiencies and additions to tax arise out of petitioners' participation in the Lake Havasu gold mine program promoted by Calzone. Respondent has asserted various reasons why he claims that the amounts

petitioners claimed as mining development expenses on their 1982 Federal income tax returns are not allowable. These reasons are: (1) The mining activity for which the development expenses are claimed was not an activity engaged in with the primary purpose and objective of making a profit; (2) the petitioners have failed to establish that the existence of ores or minerals in commercially marketable quantities had been disclosed with respect to their assigned mine at the time of their investment; (3) no deduction is allowable with respect to the notes signed by the petitioners since the notes were never funded, and, thus, the petitioners were not at risk as required by section 465; and (4) no deduction is allowable with respect to the cash paid since petitioners have not shown that such funds were used to pay any bona fide mine development expense or other deductible expense related to petitioners' mines.

Petitioners, on the other hand, contend that: (1) In petitioners' understanding and belief, commercial quantities of gold existed prior to their expenditures; (2) petitioners' contracts with Calzone required that all moneys paid be used for mine development, and, therefore, Calzone's actual use of the money is irrelevant; (3) petitioners are fully at risk as defined in section 465 on the promissory notes because under Missouri law a "holder in due course" could enforce the notes free from any and all defenses; (4) even if petitioners are not entitled to a mining expense deduction, they are entitled to a deduction for the amount of money actually paid to Calzone as an expense from an activity engaged in for profit; and (5) the losses incurred are deductible under section 165 as losses incurred in a trade or business or, at the very least, as a casualty loss.

### 1. *Losses Under Section 616, 212, or 165(c)(1) or (2)*

To qualify under section 616, the expenditures must have been paid for the development of a mine or other natural deposit (other than an oil or gas well) after the existence of ores or minerals in commercially marketable quantities has been disclosed. To qualify under section 162, 212, or 165(c)(1) or (2), the expenditures must have been incurred either in a "trade or business" or "for the production of income." However, for the deduction to be allowable under

section 616, 162, 165(c)(1) or (2), or 212, the activity giving rise to the expenditure must constitute an activity engaged in by petitioners with the primary purpose and objective of making a profit.[14] *Thomas v. Commissioner,* 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); *Capek v. Commissioner,* 86 T.C. 14, 36 (1986); *Fox v. Commissioner,* 82 T.C. 1001, 1019 (1984). Although a reasonable expectation of profit is not required, the taxpayer must have a bona fide intent and objective of realizing a profit. "'Profit" in this context means economic profit, independent of tax savings. *Capek v. Commissioner, supra; Beck v. Commissioner,* 85 T.C. 557, 569 (1985).

This Court has held that, in the case of a "generic tax shelter," the presence or absence of a profit objective is to be determined from the examination of certain objective factors which tend to indicate whether or not the disputed transaction had economic substance. *Rose v. Commissioner,* 88 T.C. 386, 414 (1987). A "generic tax shelter" has been defined as any promotion involving the following characteristics: (1) Tax benefits are the principal focus of the promotional materials; (2) the price and terms of purchase are accepted by the investors with little or no negotiation; (3) the asset in question consists of a package of purported rights, difficult to value in the abstract and substantially overvalued in relation to any tangible property included in the package; (4) any tangible property is acquired or created at a relatively small cost shortly prior to the transaction in question; and (5) the bulk of the consideration is deferred by promissory notes, nonrecourse in form or substance. *Rose v. Commissioner,* 88 T.C. at 412.

Petitioners' investment[15] in the Lake Havasu gold mine program, at least to some extent, involved all of the characteristics of a generic tax shelter. Consequently, we must determine whether there was economic substance to the transactions. For this purpose, we will consider whether the dealings between the parties to the transactions tend to

[14]However, losses from tax-motivated transactions which are unmistakably within the contemplation of congressional intent would be permitted under sec. 165(c)(2). '*Fox v. Commissioner,* 82 T.C. 1001, 1021 (1984).

[15]The word "investment" is being used herein for the sake of simplicity. We do not intend to imply by its use any conclusion as to the character of the transaction under Federal tax law as a result of petitioners' purchases of units in the Lake Havasu gold mine program.

show profit objectives on the part of petitioners, the relationship between the amounts paid by petitioners to the fair market value of their investments, and the structure of the financing used in the transactions.[16]

## 2. *The Dealings Between Petitioners and the Other Parties to the Transactions*

Petitioners argue that they entered into these transactions with the intention of making a profit. The dealings between petitioners and the other parties to these transactions show otherwise, however.

The record shows that in spite of their high level of professional training and business dealings, petitioners were totally unbusinesslike in their dealings with the promoters.[17] Petitioners made no serious attempt to determine whether the revenues from their aggregate would be sufficient to recoup their investments. Each petitioner did little more than read the 1982 offering circular prior to his decision to invest in the program. They accepted the income projection contained in the 1982 offering circular at face value.

Petitioners learned of the Lake Havasu gold mine program through their tax return preparers or financial advisor and were able, through their investment, to shelter from taxation substantial amounts of income that they received from other sources. None of the petitioners contacted his attorney for advice about the program. None of the petitioners conducted a personal investigation of the program, but rather relied solely on his financial advisor or tax preparer. At the trial, Horn did not remember how much he had paid for his investment nor did he know whether Calzone or Rick-Mine was the mining company. Avioli did not know in what State the mine was situated, and Volle did not know the size of the plot of ground or the depth of the ground in the area he purchased.

None of the petitioners had any prior knowledge of mining, and they made no attempt to learn about it before getting involved in the Lake Havasu gold mine program.

---

[16]See *Dister v. Commissioner*, T.C. Memo. 1987-217.

[17]For this purpose, "promoters" includes Wachter, Eder, Clark, and Dickherber, as well as Berger.

Petitioners relied solely for advice about the program on individuals who also had no mining experience and who were not independent of the program.

There was a total absence of any arm's-length negotiations regarding any part of the program. Petitioners blindly accepted the package deal—they could not even select the site where their "mine" would be located. Moreover, petitioners agreed to pay $25,000 ($50,000 in the case of Avioli) to Calzone as mine development expenses without conducting any investigation to determine whether this amount came anywhere near to being a reasonable charge for this purpose. None of the petitioners contacted any other mining company to find out what another company would charge to develop his "mine."

Petitioners' principal contention in support of their claimed profit objective is that they reasonably relied upon the advice of Wachter, Eder, Clark, and Dickherber with respect to their investments in the Lake Havasu gold mine program. We recognize that a prospective investor might seek and rely upon the advice of one possessing greater expertise in evaluating the economic merits of an investment. *Beck v. Commissioner,* 85 T.C. at 571. We are convinced here, however, from the record as a whole that Wachter, Eder, Clark, and Dickherber had no expertise in mining and recommended the Lake Havasu gold mine program to petitioners primarily for its tax benefits. We also are convinced that petitioners invested in the program primarily to receive those benefits.

It is improbable that petitioners or their "advisors," all of whom were inexperienced in mining, would have relied upon the feasibility study and income projection furnished by Calzone if they had given any serious consideration to any non-tax investment merits of the Lake Havasu gold mine program, particularly in light of the risks detailed in the 1982 offering circular.

Moreover, the record shows that Wachter, Eder, Clark, and Dickherber were not independent of the program and made no investigation of the program beyond the information furnished to them by Calzone — itself not an established mining company. One may well ask, why didn't Wachter, Eder, Clark, or Dickherber, at the least, call the

Arizona Department of Mines and Mineral Resources to seek information about the program? Like "The Shadow"— we know! They knew that petitioners were chasing the "glitter" of the anticipated tax benefits and not the gold supposedly contained in the ground.

We simply do not believe that petitioners' purported reliance upon Wachter, Eder, Clark, and Dickherber was reasonable. Thus, their "reliance" does not justify petitioners' failure to adequately investigate the Lake Havasu gold mine program.

Petitioners produced no witnesses to testify as to their opinions on the potential value of gold in the claims in issue. Thus, we are left with the conclusion that had testimony on this matter been presented, such evidence would have been unfavorable to petitioners. *McKay v. Commissioner*, 89 T.C. 1063 (1987); *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). In addition, the record contains no specific objective evidence establishing the value of a unit offered pursuant to the Lake Havasu gold mine program. Therefore, the record does not show that the income from petitioners' units would be sufficient for petitioners to recoup their cash payments and pay off their notes.

Respondent called Charles Johnson and Harvey Smith. Johnson testified that he did not find any gold of commercial value in the test samples he took at the mining site. Smith testified that the 1981 and 1982 offering circulars contained insufficient information to enable one to determine the grade of the material in the ground. More importantly, he testified that it would be economically infeasible to mine, alone, a plot of ground of the size of the plot in which petitioners invested. We found both witnesses' testimony forthright and credible.

Petitioners' actions after their "purchases" also show an indifference to the success of the venture. Other than a few purported inquiries directed to their tax preparers, petitioners made no attempt to insure that their aggregate was being mined or that their payments were being properly applied to mining activities. Furthermore, after Calzone filed its petition in bankruptcy, petitioners made no attempt to find a replacement mining company.

Based on the entire record, we conclude that petitioners were indifferent to whether they would make a profit from mining gold on their purported claims and that "the real profit that petitioners were looking toward was a large decrease in their tax liability from tax deductions as a result of small cash payments." *Gray v. Commissioner*, 88 T.C. 1306, 1326 (1987). It is well established that transactions entered into primarily for tax benefits are not profit motivated. *Fox v. Commissioner, supra; Gray v. Commissioner, supra.* Thus, we conclude that the dealings between the parties do not tend to show profit objectives on the part of petitioners.

### 3. *Relationship Between Cost and Fair Market Value*

As we discussed earlier, the record does not establish that the income from their units would be sufficient to recoup petitioners' cash payments and pay off their notes. Petitioners rely on the income projections and feasibility study contained in the 1982 offering circular as proof of the potential income from their investment. Petitioners, however, presented no evidence that the conclusions appearing in these documents were valid. Petitioners called no witnesses who were familiar with the mining industry. No testimony was presented by any credible witness having personal knowlege of the manner in which the various samples and tests were made.[18] Petitioners offered no expert testimony to attempt to establish that there was any profit potential from the mines.[19] The testimony of respondent's experts, Johnson and Smith, on the other hand, supports a finding that there was no profit potential. Their testimony was credible and believable. Consequently, we find that the assets which petitioners acquired had no fair market value and, therefore, the payments petitioners agreed to make greatly exceeded the approximate fair market value of their investment.

---

[18]Petitioners attempted to serve a subpoena to testify on Chastenet, but were unsuccessful because they did not have his home address. Petitioners' attorneys did make contact with Chastenet through an attorney in California who refused to give them Chastenet's home address. Petitioners also attempted to take Chastenet's deposition by agreement when they could not reach him by subpoena, but Chastenet did not appear for the deposition.

[19]See *Dister v. Commissioner, supra.*

### 4. *Structure of the Financing*

The presence of deferred debt that is in substance or in fact not likely to be paid is an indicium of lack of, or exaggeration of, economic substance. On the other hand, bona fide third-party debt may indicate that a transaction, or at least part of it, should be recognized. *Rose v. Commissioner,* 88 T.C. at 419-420. Indebtedness has been defined as "an unconditional legally enforceable obligation for the payment of money." *Autenreith v. Commissioner,* 115 F.2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); *Knetsch v. United States,* 364 U.S. 361 (1960).

On their face, the notes state that they are "full recourse promissory notes." However substance, not form, must govern. *Gregory v. Helvering,* 293 U.S. 465 (1935); *Waddell v. Commissioner,* 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988). Our review of the record leaves us convinced that no amounts were ever borrowed under the arrangements with Alpha Interchanges or Interbank. The most significant evidence in support of our conclusion is that Calzone retained ownership of the notes, no money ever changed hands, and the notes would have been difficult to fund in the ordinary course of business.

The notes were for a period of 7 years, payable in U,S. dollars, and contained a fixed rate of interest payable annually in arrears. There was no provision for remedy in case of default of payment of interest. The notes also incorporated by reference the mining and development agreement. Consequently, the notes could not stand alone. Furthermore, security for the notes was in the form of a security interest in the maker's right, title, and interest in and to any gold owned by the maker—obviously, here, purely illusory security. Thus, on this record we conclude that these notes were worthless pieces of paper.

We do not believe that individuals with petitioners' educational and business backgrounds would have executed the "full recourse" promissory notes involved here, absent assurances that these notes would never be funded. We heard petitioners' testimony that they believed they would ultimately be responsible for the promissory notes if sufficient gold were not processed to cover them. We found this testimony incredible, however. In our judgment, petitioners

did not take the notes seriously and did not think they would ever be called upon to pay them.

We reach this conclusion even in light of evidence that some of the investors, including three of the petitioners, paid purported interest on the notes in 1983. The record does not show when the investors were initially contacted about payment of the interest. We note, however, that under the terms of the purported "full recourse promissory notes," interest only was payable annually in arrears. Furthermore, all purchasers received a forgiveness of interest for the 1982 taxable year. The Internal Revenue Service commenced its examination of the Lake Havasu gold mine program in April 1983. Avioli paid purported interest in August 1983—months before any interest apparently would have been due under the terms of the purported promissory notes, but after the Internal Revenue Service began its examination. The record does not show when in 1983 Callis and Volle paid the purported interest but we believe it would not have been before April 1983. There was no evidence that any interest was requested or paid for 1984. We conclude under these facts that the payment of "interest" was "window dressing" — an attempt to give the notes the appearance of a substance that just did not exist.

The law is clear that courts may look behind a paper façade to find the actual substance and economic realities of the transactions. *Capek v. Commissioner,* 86 T.C. at 47, citing *Knetsch v. United States,* 364 U.S. 361, 369 (1960), *Gregory v. Helvering, supra, Forseth v. Commissioner,* 85 T.C. 127 (1985) [affd. sub nom. *Mahoney v. Commissioner,* 808 F.2d 1219 (6th Cir. 1987), and *Enrici v. Commissioner,* 813 F.2d 293 (9th Cir. 1987)], and *Houchins v. Commissioner,* 79 T.C. 570, 589-590 (1982). From the record here we conclude, and find accordingly, that the promissory notes were shams, created to give the illusion of an indebtedness which in fact did not exist, and, as such, are to be disregarded for Federal income tax purposes. *Capek v. Commissioner,* 86 T.C. at 49.

Smith's report and the totality of the evidence show that the Lake Havasu gold mine program was a sham — a scam — an incredulous scheme to abuse the provisions of the Internal Revenue Code. It does not take a mining engineer

to conclude that "individuals" could not "develop" their "mines" on the basis propounded by these promoters.

It is obvious from this record that the "gold" which petitioners were seeking was not located in the ground but in the anticipated tax benefits. The nature of the dealings between the parties, the total disparity between the purchase price and the fair market value of the property acquired by petitioners, and the illusory nature of the financing of the transactions convince us that petitioners' investments in the Lake Havasu gold mine program were devoid of economic substance. The transactions, therefore, do not give rise to any allowable deductions under section 616 or any other section which is dependent upon a profit objective.

### Losses Under Section 165(c)(3)

Petitioners argue in the alternative that, if respondent's experts are to be believed, the project never had a chance of success. Therefore, petitioners contend, they were defrauded and suffered a theft loss for the amount of money given Calzone and for the promissory notes which they may have to pay. Thus, petitioners argue, they can deduct under section 165(c)(3) the losses arising from the payments of cash and to the extent of the loans on which they are personally liable.

Section 165(c)(3) and (e) allows as a deduction losses from theft for the year the loss is discovered. The word "theft" is broadly defined to include any criminal appropriation of another's property. *Edwards v. Bromberg,* 232 F.2d 107, 110 (5th Cir. 1956).

Petitioners bear the burden of proving their entitlement to theft loss deductions. *Welch v. Helvering,* 290 U.S. 111 (1933); *New Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934); Rule 142(a). The determination of whether a theft loss has been sustained depends upon the law of the jurisdiction where the loss occurred, in this case the law of the State of Missouri. *Monteleone v. Commissioner,* 34 T.C. 688, 692 (1960). Petitioners do not cite the Missouri statute upon which they rely for their contention of fraud.

Based on the record before this Court, we cannot say that petitioners were swindled on the basis of false representa-

tions made to them by the promoters and their tax advisors, Berger, Wachter, Eder, Clark, and/or Dickherber, which persuaded petitioners to participate in the Lake Havasu gold mine program. Petitioners have not set forth any other possible ground to sustain their allegations of theft losses. Moreover, the record does not support a finding that, if a theft did occur, petitioners discovered the loss in 1982. Finally, we believe petitioners' greedy quest for tax writeoffs is as much responsible for their predicament as is the unscrupulous action of the promoters and their tax advisors. They stand in pari delicto. Petitioners have failed to sustain their burden of proof on this issue. No deduction, therefore, is allowable under section 165(c)(3).

We have considered petitioners' other contentions but find them to be without merit. Since we have concluded that petitioners' activities with respect to their interests in the mining claims were devoid of economic substance, we need not address respondent's alternative arguments for disallowance of the claimed deductions.

### The Additions to Tax

*Section 6653(a).*

Section 6653(a)(1) provides that, if any part of any underpayment of tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a)(2) provides that if any part of an underpayment of tax is due to negligence or intentional disregard of the rules and regulations, there shall be added to the tax, in addition to the 5-percent addition already provided by section 6653(a)(1), an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence. The addition to tax under section 6653(a)(2) is imposed for the period beginning on the last day prescribed by law for payment of such underpayment. Respondent's determination is presumed correct and the burden is on petitioners to prove these additions are erroneous. *Enoch v. Commissioner*, 57 T.C. 781 (1972).

Under section 6653(a), negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent

person would do under the circumstances. *Neely v. Commissioner*, 85 T.C. 934, 947 (1985). Petitioners contend that they were not negligent because they reasonably relied upon the advice of their tax preparers. Where a taxpayer has relied upon the advice of a competent accountant, experienced in tax matters, to prepare his return, the Court has held inapplicable the addition to tax under section 6653(a). See *Conlorez Corp. v. Commissioner*, 51 T.C. 467, 474 (1968). However, in cases accepting a "reliance" argument, the taxpayer has acted in good faith.

We find it difficult to believe that petitioners, all well-educated and experienced in business and tax matters, could have envisioned the Lake Havasu gold mine program as anything other than a "flagrant tax avoidance scheme." *Wesenberg v. Commissioner*, 69 T.C. 1005, 1015 (1978). Petitioners made no attempt to verify independently any of the information contained in the 1982 offering circular. In addition, they knew or should have known that Wachter, Eder, Clark, and/or Dickherber were not experts in mining and were being compensated by the promoter for the units sold to petitioners and, therefore, were not independent of the promotion. We believe that the type of advice which petitioners received from these individuals would not be relied on by a reasonable person in making a business decision. Considering the facts here as a whole, we conclude that petitioners have not shown that the underpayment in tax was not due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). Therefore, we find that petitioners are liable for the additions to tax under section 6653(a)(1) and (2) as determined by respondent.

*Section 6661*

Respondent also determined an addition to tax under section 6661, which imposes an addition to tax if there is a substantial understatement of income tax.[20] An understatement is substantial when the understatement exceeds the greater of $5,000 or 10 percent of the amount of tax required to be shown on the return. The amount of the

[20]An understatement occurs when the amount of tax shown on the return, less any rebate, is less than the amount of tax required to be shown on the return. See sec. 6661(b)(2)(A).

addition to tax under section 6661(a) is equal to 25 percent of any underpayment attributable to the substantial understatement.[21] Where an item is attributable to a tax shelter,[22] such as is involved here, the understatement is reduced by amounts attributable to the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment, and the taxpayer reasonably believed that the tax treatment of such item by the taxpayer was more likely than not the proper treatment. Sec. 6661(b)(2)(c).

Petitioners contend that at the time their investment was made they entered into the Lake Havasu gold mine program with the requisite profit objective and that the mining expense deductions claimed on their Schedules C are non-tax-shelter items. Alternatively, petitioners argue that: (1) The treatment of the mining deduction item on Schedule C is or was supported by substantial authority; (2) the facts relevant to the tax treatment of the Schedule C deduction were disclosed on their 1982 Federal income tax returns; and (3) petitioners were reasonable in their belief that the treatment of the Schedule C deduction was the proper tax treatment for these deductions on their 1982 income tax returns.

For the reasons stated above, we have found that the Lake Havasu gold mine program was a sham. The Supreme Court has held for many years that claims based upon unreal and sham transactions are not recognizable for tax purposes. See *Gregory v. Helvering, supra. Higgins v. Smith,* 308 U.S. 473 (1940); *Knetsch v. Commissioner, supra.* Petitioners have not presented substantial authority for their position or shown that they reasonably believed that the tax treatment they claimed was more likely than not the proper tax treatments.

From this record, it is apparent that petitioners were mature, well-educated, and experienced individuals who were "sufficiently knowledgeable and sophisticated with respect to business and tax matters to have known, and actually did know, at the time the disputed transactions were

---

[21]See *Pallottini v. Commissioner,* 90 T.C. 498 (1988). In this case, respondent determined the addition based on 10 percent of the underpayment and has not sought an increase in such amount. Thus, we sustain the addition in the amount determined by respondent.

[22]Defined in sec. 6661(b)(2)(C)(ii).

entered into, that the transactions were 'too good' to be real and therefore were shams." *Brown v. Commissioner,* 85 T.C. 968, 1001 (1985), affd. sub nom. *Sochin v. Commissioner,* 843 F.2d 351 (9th Cir. 1988). Thus, as noted above, there is no basis to find that petitioners reasonably believed that their tax treatment of their Lake Havasu gold mine program investment was proper, and petitioners' claim that they relied upon the advice of their tax preparers for the tax treatment of their investment in the Lake Havasu gold mine program is no shield against imposition of the section 6661 addition. We have considered petitioners' other arguments on this issue and find them unpersuasive. Therefore, we sustain respondent's determination of the addition to tax under section 6661(a).

*Section 6621(c)*

In the statutory notice issued to the Volles, respondent also determined the increased rate of interest imposed by section 6621(c) with respect to any "substantial understatement" attributable to one or more tax-motivated transactions.[23] The increased rate applies to interest accruing after December 31, 1984. Section 6621(c)(3)(A)(v) includes within the definition of a "tax motivated transaction" any sham or fraudulent transaction. Under section 6621(c), the term "sham" means a transaction which has no economic substance. *Cherin v. Commissioner,* 89 T.C. 986, 1000 (1987); *Patin v. Commissioner,* 88 T.C. 1086, 1125 (1987).

The Volles raised the issue of respondent's imposition of section 6621(c) for the first time in their reply brief. We find that this failure to raise timely the 6621(c) issue constitutes a waiver of this issue. See Rule 34(b)(4); *Markwardt v. Commissioner,* 64 T.C. 989, 997 (1975). Nonetheless, even if we had not found that petitioners waived this issue, we would sustain the imposition of the increased rate of interest. We already have held that the Lake Havasu gold mine program was devoid of any economic substance. We have considered petitioners' other arguments on this issue and find them to be without merit. Accordingly, the increased rate of interest provided for in section 6621(c) is

---

[23]For purposes of sec. 6621(c), "substantial underpayment" means an underpayment which exceeds $1,000. See sec. 6621(c)(2).

applicable to the underpayments attributable to the disallowed losses the Volles claimed pertaining to their investment in the Lake Havasu gold mine program.

### Award of Damages

On our own initiative, we now consider the imposition of damages against petitioners. Section 6673 provides that this Court may award to the United States damages in an amount not in excess of $5,000 "Whenever it appears to the Tax Court that proceedings before it have been instituted primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless."

Petitioners have claimed five-to-one "leveraged" deductions based on "recourse'" promissory notes which we have found to have no economic substance. Petitioners made no attempt to verify independently the representations contained in the 1982 offering circular as to the potential profitability of the program or the qualifications or reliability of Calzone, Berger, or Chastenet. Petitioners made no attempt to verify independently that the charges for the program were reasonable or that the money was being used for the purposes indicated. Instead, petitioners purportedly chose to rely solely upon the representations of individuals who were not independent of the offering itself.

It is obvious from the facts of this case that the Lake Havasu gold mine program was an abusive tax shelter. Furthermore, as stated above, we are convinced that petitioners knew, at the time they entered into the disputed transactions, that the program was a sham.

Most telling on the issue of the imposition of damages here is the fact that petitioners continued to maintain this proceeding even though, prior to the time that trial commenced, Wachter, Clark, and Dickherber — the advisors upon whom petitioners purportedly relied — entered into consents to the entries of final judgments of permanent injunction in which they were enjoined from representing that:

an investor in the [Havasu Gold] Tax Shelter will be entitled to deductions, for federal income tax purposes, including deductions for mine development expenditures and for interest paid or accrued on notes, * * *

We believe that petitioners were well aware that the program was a sham from the time they entered into the program. Nevertheless, they continued to maintain this proceeding.

In *O'Neal v. Commissioner,* 84 T.C. 1235, 1243-1244 (1985), we stated:

The conferees in discussing damages under section 6673 stated "The conferees believe that, with this amendment, the Congress has given the Tax Court sufficient tools to manage its docket, and that the responsibility for effectively managing that docket and reducing the backlog now lies with the Tax Court." H. Rept. 98-861 (Conf.) (1984), 1984-3 C.B. (Vol. 2) 1, 239. Congress also noted with approval the steps that this Court has taken in the tax shelter and tax protester areas and stated that this "Court should take further action in these two areas, as well as to assert, without hesitancy in appropriate instances, the penalties that the Congress has provided." H. Rept. 98-861, *supra* at 239.

We also have stated in *Elliott v. Commissioner,* 84 T.C. 227, 248 (1985), [affd. without published opinion 782 F.2d 1027 (3d Cir. 1986)] that "At some point, the arguments in these highly leveraged tax avoidance (or evasion) schemes must be regarded as 'frivolous or groundless,' " citing section 6673. We have frequently found that cases based upon meritless contentions and stale arguments are burdensome both on this Court and upon society as a whole. See *Abrams v. Commissioner,* 82 T.C. 403 (1984). The time spent upon this case has delayed other cases of merit which could have provided new precedents to the tax system. * * *

We believe that this is an appropriate case for the imposition of damages inasmuch as we believe that petitioners knew very well in advance of trial that there was no basis in law or fact for the deductions they claimed.

Petitioners should not be surprised at our decision here to impose damages since, prior to the time this case was tried, we warned petitioners who were parties to abusive tax shelters of possible consequences should they continue to pursue such frivolous or groundless actions. We previously have said:

In conclusion, it is apparent from the overall record of this case that petitioner was a party to an abusive tax shelter. This type of arrangement disparages good tax planning and denigrates both the Congressional purpose inherent in the credits and deductions which we here disallow and our national tax system. Petitioner knew, or reasonably should have known, this when he agreed to participate in this specious stratagem of tax illusion. Petitioner, and those like him, who exchange small cash amounts for large tax deductions because of pie-in-the-sky nonrecourse transactions arranged to jack up basis without underlying

economic substance or entrepreneural risk may become subject to consequences unanticipated by the parties. See *Barnard v. Commissioner,* 731 F.2d 230 (4th Cir. 1984), affg. *Fox v. Commissioner,* 80 T.C. 972 (1983). [*Snyder v. Commissioner,* T.C. Memo. 1985-9 (49 T.C.M. 458, 54 P-H Memo T.C. par. 85,009, at 85-39).]

Petitioners knew, or reasonably should have known, that the Lake Havasu gold mine program was an abusive tax shelter. Nevertheless, they continued to maintain these proceedings, thereby wasting our time which could have been better spent on cases of merit. This Court cannot afford to condone such a waste of our limited judicial resources. Consequently, based on our review of the entire record, we find that petitioners' positions are frivolous and groundless and that the proceeding was instituted and maintained primarily for delay. Therefore, we award damages to the United States under section 6673 in the amount of $5,000 for each docket consolidated herein, for a total amount of $20,000.

*An appropriate order and decisions will be entered for the respondent.*