ROBERT G. DAVIS AND JOBEE DAVIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Davis v. Commissioner
Docket No. 29295-86
United States Tax Court
T.C. Memo 1989-635; 1989 Tax Ct. Memo LEXIS 635; 58 T.C.M. (CCH) 777; T.C.M. (RIA) 89635; November 28, 1989
Robert G. Davis, pro se. William P. Hardeman, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency dated April 15, 1986, determined a deficiency *638 of $ 13,543.94 in petitioners' 1982 Federal income tax and additions to tax under sections 6653(a)(1), [1]6661, 6653(a)(2), and 6621(c) in the respective amounts of $ 2,790.14, $ 3,385.98, 50 percent of the interest on the income tax deficiency redetermined, and 120 percent of the interest. The deficiency resulted from the disallowance of a $ 50,000 expense deduction related to petitioners' "investment" [2] in the "TAX ADVANTAGED ORE PURCHASING PROGRAM BY GOLDFIELD DEEP MINES COMPANY OF NEVADA" and a claimed loss of $ 4,589 attributable to petitioners' investment in a cable television limited partnership. The issues presented for our consideration are as follows: (1) Whether petitioners' mineral ore [3] investment is deductible under sections 616 or 162; (2) whether petitioners are entitled to the claimed loss from their cable television investment; and (3) whether petitioners are liable for various additions to tax. *639 FINDINGS OF FACT The parties' stipulation of facts together with the attached exhibits are incorporated by this reference. Petitioners Robert G. Davis and JoBee Davis (references to petitioner in the singular shall refer to Robert G. Davis) resided in Dallas, Texas, when the petition was filed in this case. Petitioner has been an attorney since approximately 1960, employed as a corporate lawyer by a number of large publicly held corporations. He has practiced law primarily in the corporate, business and securities fields and, to a lesser extent, in the tax area. Mrs. Davis is an educated individual with extensive professional work experience. She has worked in the telecommunications business, successfully designing and selling telecommunication "applications." Mrs. Davis has also owned dance studios where she taught ballet dancing. Goldfield Deep Mines Co. of Nevada
Sometime prior to December 23, 1982, petitioners were introduced to a mineral ore program entitled "TAX ADVANTAGED ORE PURCHASING PROGRAM BY GOLDFIELD DEEP MINES COMPANY OF NEVADA." This investment was proposed to petitioners by Doug Coleman (Coleman), a business associate of Mrs. Davis. Coleman, a financial *640 planner and president of a finance company, had for several years arranged financing for telecommunications customers of Mrs. Davis. In return for selling this investment to petitioners and to numerous other investors, Coleman received a commission from Goldfield Deep Mines Company of Nevada (Goldfield). Petitioners had no education or experience in the mining or mineral ore business before their involvement with the program. Goldfield distributed a promotional brochure describing the program to potential investors, including petitioners. The brochure characterized the program as an opportunity to purchase various quantities of previously mined mineral ore, ostensibly providing an investor with certain benefits. The first page of the brochure summarized the purported benefits of the program as follows: TAX ADVANTAGED ORE PURCHASING PROGRAM BY GOLDFIELD DEEP MINES COMPANY OF NEVADA
Purchasers are being offered the opportunity to purchase mineral ore on a tonnage basis. Goldfield Deep Mines owns the right to explore, develop, and mine the mineral aggregate of the St. Ives Mine located in Goldfield, Nevada. The purchaser of the mineral ore will receive the following benefits: *641 * TAX FREE INCOME - It is the opinion of our tax consultants that until bullion is sold and converted to dollars it is not taxable. * PROJECTED POTENTIAL RETURN ON CASH - 91% in addition to recapture of initial cash. * TAX ADVANTAGES - Up to 500% leveraged purchase. * LEGAL REPRESENTATION - The Company has retained a prominent law firm to answer any legal questions, and, if necessary, defend the program before the Internal Revenue Service. * SIMPLICITY - Supervision of all management and administrative activities, including all legal and financial requirements, will be carried out by a Company with more than fifty years experience in the mining business. The program was explained in subsequent pages of the brochure as follows: HOW THE ORE PURCHASING PROGRAM WORKS Example: Buy 125 tons of mineral ore from the Company. Your ore will cost you a total of $ 400 per ton plus the royalty prevailing at time of settlement, plus refining cost of all metals extracted from your ore. The cost charged per ton is for mine development, mining, research and site development. You may mine the ore yourself; you may contract with a reputable mining company to mine your ore; or you may *642 contract with Goldfield Deep Mines by executing the mining agreement. Should you prefer to execute the mining agreement with Goldfield Deep Mines, you will pay $ 10,000 upon signing and execute a promissory note for the balance of $ 40,000. The note is issued by a financial institution for a period of one year and bears interest at the rate of 15% per annum. The note can be renewed and extended for up to ten years at prime rate, or lower, as established by Bank of America, U.S.A. provided all provisions of the note are adhered to. This is a full recourse note and the maker is fully liable. If you choose not to leverage your purchase, you may pay all cash upon signing the mining and security agreement. According to the mining and security agreement, the note, royalty, and any interest due but, unpaid are deducted from the total metals produced. You have the option of paying the note in U.S. dollars from your own or other borrowed funds and retaining all metals in kind. The minimum purchase is 25 tons. Various increments of ore can be purchased to coincide with your personal financial situation. The examples below reflect various amounts which may be purchased. DEDUCTIBLE
ORE
CASH
BALANCE
DEVELOPMENT
LEVERAGE
PURCHASED
DOWN PAYMENT
ON NOTE
EXPENSE
PURCHASE
25 Tons
$  2,000
$   8,000
$  10,000
500%
40 Tons
$  3,200
$  12,800
$  16,000
500%
50 Tons
$  4,000
$  16,000
$  20,000
500%
125 Tons
$ 10,000
$  40,000
$  50,000
500%
250 Tons
$ 20,000
$  80,000
$ 100,000
500%
500 Tons
$ 40,000
$ 160,000
$ 200,000
500%
*643 All mine development, mining, and refining should be complete by 1988. Mine development is currently underway, and significant bullion should be produced during 1982-83. The present schedule of development and mining is based upon anticipated production within fourteen to eighteen months after execution of the mining agreement. Each principal will be notified as to when his ore will be mined by certified letter. The ore will be refined in numerical sequence based upon the date of the various mining contracts. The first contracts for ore will be the first contracts processed. * * * Assuming you execute the mining and security agreement with Goldfield Deep Mines, you now own the ore. Goldfield will then proceed with the mine development, mining, research and site improvement to produce your 125 tons of mineral ore. * * * The brochure represented that Goldfield's mineral properties were located in what has been referred to as the "Goldfield mining district," an area near Goldfield, Nevada. Goldfield, Nevada, is approximately 400 miles northeast of Los Angeles and 195 miles north of Las Vegas. A brief history of Goldfield was also provided, along with a description of its *644 mining properties and their purported mineral contents. Some excerpts from the brochure follow: Goldfield Deep Mines was formed in 1920 to explore and develop mineral properties. The San Bernardino-based company is owner of seven mineral properties in Esmeralda County, Nevada * * *. * * * The company's patented claims are recorded in the name of AAA Financial, a wholly owned subsidiary of the company. The properties are designated as: Union Jack
Survey
2560
Atlanta
Survey
2560
St. Ives
Survey
2199
Moonshine
Survey
3839
Algae
Survey
3843
Sunflower
Survey
3843
Combination
Survey
2557
The main shaft is on the St. Ives claim with a 2,350 foot depth and diamond drilling to 2,535 feet. The claims were originally operated by Calumet and Hecla, and after the War by Newmont Mining Corporation of New York. A 1966 United States Geological [sic] Survey estimated that 80-82% of the Goldfield District remained undeveloped. In 1972 work was begun on feasibility studies of new processing and milling equipment in order to process the approximately 4,000,000 tons of secondary ore from former operations. In 1974 a company chemist sampled various *645 surface areas on the properties and verified sufficient gold and silver content to be of commercial quality and quantity. The assay was made from the aggregate of the listed mine and the secondary ore yielded on a per ton basis: 13.20 troy oz. silver; 3.63 troy oz. platinum; 1.87 troy oz. gold; and 1.50 troy oz. palladium. The metal valuations referred to in the brochure were the result of a total composite of all the Goldfield mines or their corresponding waste dumps. This method resulted in an average valuation, with no information disclosed on any particular mine or ore deposit. The brochure projected a 91-percent return on the cash portion of a participant's investment. The projection assumed that the investor would purchase 125 tons of ore for $ 50,000, $ 10,000 in cash and the remaining $ 40,000 from the proceeds of a loan. The 91-percent return was calculated as follows: Total expected values per 125 tons of ore: Gold - 2 troy ounces per ton at $ 350 per ounce
$  87,500
Silver - 15 troy ounces per ton at $ 9 per ounce
16,875
Total expected value
$ 104,375
Estimated Costs: Development expense
$ 50,000
Royalty
20,875
Refining and smelting
17,500
Storage cost of ore
384
Storage, insurance and security of bullion
552
Interest (one year)
6,000
Total expected costs
95,311
Net Estimated Return
$  9,064
Estimated return on original cash investment of $ 10,000 is 91%.
*646 Although the brochure projected a return on a participant's original cash investment, primary emphasis was on the tax benefits to be obtained and the tax consequences for participating in the program. The first page of the brochure identified the name of the program as the "TAX ADVANTAGED ORE PURCHASING PROGRAM BY GOLDFIELD DEEP MINES COMPANY OF NEVADA," and it projected certain tax benefits from a "500% leveraged purchase." The brochure identified the tax benefits further in a section entitled "TAX LAWS FAVOR THE MINING BUSINESS." The first paragraph of this section was as follows: The costs associated with developing a mine are immediately tax deductible. A mine operator in a high tax bracket might find that his costs for mining are largely offset by reductions in what he would otherwise pay in income taxes. With leverage, he might save more in taxes than he invests to create a producing mine. The remainder of this section described other tax benefits ostensibly associated with mining, including allowances for depletion, and the postponement of income tax that may result from the production of gold and silver. The brochure illustrated the tax benefits provided an investor *647 in the 50-percent tax bracket: On your tax return for the year in which you entered the ore purchasing program, you would file a Schedule C - Profit or Loss From Business or Profession - which would reflect no income and a mine development expense in the amount of ore contracted for. $ 50,000 in our example. Assuming you had $ 50,000 of income, subject to a tax rate of 50%, you would realize an immediate tax reduction of $ 25,000 for a $ 10,000 cash payment, and, in addition, have the potential of profiting more in tax free bullion. In addition, the brochure provided a sample IRS Form 1040 Schedule C demonstrating how to report and deduct a participant's entire investment as "Mine development, Mining, Research and site development" expenses. The sample Schedule C reflected income from the mining activity of $ 0 and a net loss equal to the amount invested. The brochure also provided a section devoted to "Questions and Answers Relative to the Ore Purchasing Program." Ten of the 13 questions and answers were dedicated to the tax effects of the investment: WHAT IS THE DEDUCTIBLE DEVELOPMENT EXPENSE FOR 1982? WHAT IF A PRINCIPAL CANNOT UTILIZE THE FULL AMOUNT OF DEDUCTIBLE DEVELOPMENT *648 EXPENSE FOR 1982? DOES A TAX ADVANTAGED INVESTMENT INCREASE THE RISK OF AN AUDIT? IS AN INCOME TAX AUDIT A NERVE WRACKING EXPERIENCE? WHAT IF THE INTERNAL REVENUE SERVICE ATTEMPTS TO DISALLOW THE DEDUCTION FOR MINE DEVELOPMENT EXPENSE? WHY INVEST IN A TAX ADVANTAGED INVESTMENT? WHY NOT JUST PAY ONES [sic] INCOME TAX AND FORGET IT? MY TAX ADVISOR HAS RESERVATIONS - WHY? HAS THE INTERNAL REVENUE SERVICE APPROVED THE PROGRAM? WHAT IS THE LEVERAGED TAX ADVANTAGED INVESTMENT? WILL A LEVERAGED TAX ADVANTAGED INVESTMENT BE AUTOMATICALLY BE [sic] DISALLOWED BY THE INTERNAL REVENUE SERVICE? In addition to the brochure, petitioners received a written tax opinion dated April 13, 1981, prepared for Goldfield by the law firm of Arnett and Hatten. The tax opinion stated that it was based on statements made to Arnett and Hatten by Goldfield, and that no independent investigation was conducted by the law firm. Approximately two pages of the 12-page tax opinion were devoted to a discussion of the requirement that the activity must be engaged in for profit as a prerequisite to deductions claimed by an investor. The tax opinion also discussed the requirements for deductibility *649 under sections 162 and 616. Petitioner, in evaluating the Goldfield program before investing, primarily relied on the promotional material prepared and furnished by Goldfield. Petitioner's review of the promotional material revealed that the disclosure documents were not in compliance with the securities laws. In addition, petitioner conducted what he termed as an "oral" investigation -- in other words, he talked to other people. Petitioner did not share the specifics of his investigation other than that he talked to people where he worked, including some company officials and financial officers; he talked to a member of the law firm that prepared the tax opinion for Goldfield, Arnett and Hatten; he talked to various accountants; he talked to officials at Goldfield; and he talked to Doug Coleman, the individual who introduced petitioners to the program. Petitioners also talked to a Mr. Pace, a financial planner employed by one of Mrs. Davis' clients. Mrs. Davis testified that as a favor, Mr. Pace "looked over" the promotional documents and concluded that they "looked really good." Petitioners did not consult with anyone independent of Goldfield who was knowledgeable about the *650 mining business, generally, or Goldfield, specifically. The individuals who were independent of Goldfield were unfamiliar with the promotion and only reviewed the promotional material Goldfield provided petitioners. On December 23, 1982, petitioner entered into a purchase agreement with Goldfield for the purchase of 125 tons of ore at a purported price of $ 50,000. The purchase agreement did not identify or segregate petitioner's ore, leaving Goldfield with the discretion to chose from where petitioner's, and the other investors', portion of ore would come. The purchase agreement provided as follows: PURCHASE AGREEMENT This AGREEMENT is entered into this 23rd day of December 1982, by and between Goldfield Deep Mines Co. of Nevada, hereinafter referred to as SELLER, and Robert G. Davis, hereinafter referred to as BUYER. WHEREAS, the SELLER has exclusive right to extract, mine, develop and refine ore reserves on the St. Ives Mine in Goldfield, Nevada and the BUYER desires to immediately purchase 125 tons of mineral ore, bearing gold and other metals (the "Ore") from said SELLER and the SELLER agrees to sell said ore at the execution of this agreement, subject *651 to the following terms and conditions: 1. The SELLER will now sell said ORE to BUYER and BUYER shall now pay the sum of $ 50,000 upon signing this agreement, and the BUYER shall further pay, as of the balance of the purchase price, royalty of 25% of the total metals extracted. 2. The BUYER shall have full and complete title to the ORE, and the BUYER has the right to mine said ORE himself, or he may contract with others to mine the said ORE. In the event BUYER decides to mine the ORE himself, he agrees to follow safe and legal mining practices and post a $ 20,000 bond in favor of Goldfield Deep Mines Co. to cover any and all liabilities arising from said mining. 3. It is agreed by the SELLER and BUYER that all mining operations of the said ORE shall commence within one year hereof and will be completed not later than six years, from the date hereof. 4. Execution hereof by the SELLER is an acknowledgment and representation relied upon the BUYER as a part of the consideration hereof that deposits of ore bearing gold and other metals, are shown to exist in sufficient quantity and quality to reasonably justify commercial exploitation and mining extraction. Petitioner purportedly *652 paid the $ 50,000 purchase price with $ 10,000 in cash (in the form of a cashier's check) and the proceeds of a $ 40,000 loan. The $ 40,000 was purportedly lent to petitioner by City Continental Financial (CCF). CCF allegedly paid the loan proceeds directly to Goldfield. In turn, petitioner executed a "promissory note," entitled "Full Recourse Secured Promissory Note," with a face value of $ 40,000, made payable to CCF. The note was for one year with an option to extend the note for ten years. It provided that Goldfield's wholly owned subsidiary, AAA-Financial Corporation, was CCF's "authorized agent" to accept payment on the note. The promissory note specified that interest was payable at the rate of 15 percent per annum with the first payment due three months from the date of the note. The note was dated December 23, 1982; the first interest payment was due on March 23, 1983. To "secure" the note, petitioner executed a security agreement. The only security identified by the agreement was the ore purchased by petitioner, including any extracted precious metal. In addition, the security agreement, along with the brochure, provided that all charges, including charges with respect *653 to the note, interest payable under the note, and royalties, would be deducted from the total metals produced. Petitioners have neither made any payments on the note nor have they ever been requested to do so. Petitioner also entered into a separate agreement to have Goldfield refine the ore at a price of $ 40 per troy ounce of gold and $ 4 per troy ounce of silver. In addition, petitioner agreed to pay various other fees for the refinement of other minerals which were purported to exist in the tonnage of material purchased. An additional amount of $ 42 per ton would be charged for loading and shipping the ore to Goldfield's refining facility in Riverside, California. Goldfield's refining facility was inadequate to process commercial quantities of the purchased ore. Approximately 300 other investors participated in the Goldfield program, executing purchase agreements that were similar to petitioner's. In total, Goldfield sold approximately 15,000 tons of ore to the program participants. During the first half of 1982, Goldfield was allegedly processing an average of approximately 2.5 tons of ore per day. From January 1, 1982, to July 31, 1982, Goldfield allegedly processed *654 a total of approximately 375 tons of ore. On April 1, 1983, the Securities and Exchange Commission brought an action against Goldfield in the United States District Court in Los Angeles, California, for selling unregistered securities in violation of Federal securities laws. Soon thereafter, the Federal Court issued a temporary restraining order against Goldfield regarding the sale of securities which was later converted into a permanent injunction. On or about April 14, 1983, Goldfield filed for protection under the United States bankruptcy laws. On or about April 24, 1983, a bankruptcy trustee (or receiver) was appointed to take over the affairs of Goldfield. Petitioners have not produced any gold, silver, or other precious metals from the ore they purchased. On Schedule C of petitioners' 1982 Federal income tax return, petitioners claimed their mining activity as a business and deducted their $ 50,000 "investment" as an expense for mine development, mining, research and site development. Because no income was reported from this activity, petitioners claimed a $ 50,000 loss from their mining "business." The mining loss reduced petitioners' 1982 taxable income and resulting *655 income tax to $ 0. Respondent's Expert[4]
Respondent presented the testimony and expert report of Ernest B. Rhoads (Rhoads), a mining engineer employed by respondent. Rhoads evaluated the program and petitioners' investment in the program. Rhoads conducted an investigation on the mining history of Goldfield and the Goldfield mines; he also visited the mines and talked to various people associated with Goldfield. We found Rhoads qualified as an expert to testify on general principles of mining and the results of his investigation. [5] We found him forthright and honest. However, we did not find him qualified to testify on the more technical subject matter of extracting metals from ore. Rhoads lacked sufficient experience in this area. *656 On January 19, 1983, Rhoads visited the St. Ives Mine site with Orin Swain, chairman of Goldfield's board of directors, Allen Harter, Goldfield's attorney, and Willard A. Luegge, Goldfield's primary assayer. During this inspection, Mr. Swain and Mr. Harter admitted that the St. Ives claim was the only property being worked on by Goldfield and that all the ore purchased by investors in the program was contained in the "St. Ives waste dump," ore that had remained above ground after prior mining extractions. [6] The Goldfield mines were not operating, had not operated for many years, and were not suitable for any mining operations. The mine shaft was in a state of disrepair; it was rusted; there were no cables to run the skips (elevators); and some of the supporting timbers were broken. In addition, there had not been any recent mine development on Goldfield's mineral properties. Danville South CATV, Ltd. Petitioners, in addition to their involvement in the Goldfield program, invested in a limited partnership named Danville South CATV, *657 Ltd. (Danville). On Schedule E of their 1982 Federal income tax return, petitioners claimed a $ 9,427 loss from their participation in Danville. Subsequently, a dispute arose between respondent and various individuals and cable television companies who apparently were general partners in Danville and numerous other cable television limited partnerships. Respondent intended to disallow certain tax benefits claimed by the investors, including petitioners, who purchased the limited partnership interests in 1982 and 1983, and to assert additions to tax under sections 6653(a), 6659, and 6661. Respondent and the general partners reached an agreement whereby respondent would allow some portions of the claimed tax benefits. Accordingly, respondent and the general partners executed a closing agreement on December 11, 1984, which states, in relevant part, as follows: 2. With respect to the taxable years 1982 and 1983, the I.R.S. shall allow the investors certain tax benefits herein described and shall not assert penalties against the investors pursuant to Internal Revenue Code Sections 6653(a), 6659 and 6661 with respect to any claimed income tax deductions *658 from the said taxpayers' cable television limited partnerships * * *; provided, however, that the investors file amended income tax returns together with photocopies of the original returns with the I.R.S. on or before February 15, 1985, with said amended income tax returns reflecting the hereinafter described "modified expense deduction" and the "modified basis for depreciation and investment tax credit". In February 14, 1985, petitioners filed an amended 1982 income tax return (Form 1040X) with respondent whereby they reduced their allocable portion of Danville's loss by $ 4,589 to $ 4,838. On page 2, part II, of their Form 1040X entitled "Explanation of Changes to Income, Deductions, and Credits," petitioners explained the change as follows: "Amended K-1 on Partnership reduced from (9427) to (4838) ordinary loss due to audit of Partnership and Agreement per attached closing Agreement. This reduces line 18 by (4589)." Notice of Deficiency
Respondent, in the notice of deficiency, determined that a deficiency of $ 13,543.94 existed in petitioners' 1982 income tax. Respondent disallowed petitioners' $ 50,000 expense deduction related to Goldfield, and disallowed the Danville *659 loss as it appeared in petitioners' amended return. The Explanation of Adjustments with respect to petitioners' mining deduction included the following: The deduction of $ 50,000.00 shown on your 1982 income tax return(s), respectively, as mine development expense or loss is not allowable because you have not established (1) that the alleged events or transactions giving rise to such deductions were bona fide, were entered into for profit, and actually occurred in fact or in substance, (2) that the alleged deductions and your participation in the alleged mine development had any economic reality, purpose, or substance other than the avoidance of tax, (3) that any amount was paid or incurred during the taxable year(s) in connection with the alleged mine development expenses, including any alleged exploration expenses such as for ascertaining the existence, location, extent, or quality of any deposit of ore, (4) that you acquired any interest in any mineral property, (5) that the alleged venture or activity constituted an on-going trade or business, and In any event, and in the alternative, no loss of mining development expense deduction is allowable in excess of your *660 actual cash outlay, if any, to the activity since you were not at risk with respect to any greater amount than actual cash paid. Respondent provided the following explanation with respect to Danville: "We adjusted your return in accordance with the partnership return, which has also been examined." The notice also reflected respondent's allowance of a $ 383 investment tax credit attributable to Danville. Respondent explained that the "Investment tax credit was allowed in the amount shown from the partnership examination." In addition, respondent determined that petitioners were liable for additions to tax under sections 6653(a), 6621, and 6661. OPINION The disputed income tax deficiency and additions to tax arise out of petitioners' participation in the Goldfield Deep Mines program and the Danville program. The Goldfield Program
Respondent has asserted various reasons why the $ 50,000 in mining expenses claimed by petitioners on their 1982 Federal income tax return are not allowable. Respondent's primary arguments are that the mining activity lacked economic substance and that petitioners did not engage in the mining activity with an actual and honest objective *661 of making a profit. Respondent's alternative arguments include the following: (1) Petitioners' $ 50,000 investment was a capital expenditure and, therefore, not currently deductible; (2) petitioners have failed to establish that any portion of their expenses were paid or incurred in the "mining" or extraction of material or in its "research" to be deductible under section 162; (3) petitioners have failed to establish that their expenses are deductible under section 616 "for the development of a mine or other natural deposit * * * if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed;" and (4) even if petitioners are entitled to a deduction for mine development expenditures, the deductible amount should not include the $ 40,000 represented by the note signed by petitioners because petitioners, in substance, were not at-risk as required by section 465. Conversely, petitioners contend that their $ 50,000 investment is deductible for the following reasons: (1) Their investment in the Goldfield program was motivated by an objective for profit and not for the anticipated concomitant tax benefits; (2) in accordance with section *662 616, their investment was devoted to the development of the Goldfield mines which contained precious minerals in commercially marketable quantities disclosed prior to petitioners' investment; and (3) their investment is deductible under section 162 as an ordinary and necessary business expense. Section 616(a) allows a deduction, in lieu of what normally may be a capital charge, for all expenditures paid or incurred during the taxable year for the development of a mine or other natural deposit (other than an oil or gas well) if paid or incurred after the existence of ores or minerals in commercially marketable quantities has been disclosed. No deduction is allowable under section 616 for the cost of acquiring an interest in a mine or other natural deposit -- those expenses are capitalized. Sec. 263; sec. 1.616-1(b)(4), Income Tax Regs.Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *." To be deductible under section 162, the expenditures must be current *663 expenses, not capital expenditures. Commissioner v. Lincoln Savings and Loan Association, 403 U.S. 345 (1971); National Starch & Chemical Corp. v. Commissioner , 93 T.C. 67 (1989). In addition to these requirements, sections 616(a) and 162(a) have a common threshold requirement. Both parties agree that for a deduction to be allowable under either section 616 or 162, the activity giving rise to the expenditure must constitute an activity engaged in by petitioners with an actual and honest objective of making a profit. Horn v. Commissioner, 90 T.C. 908, 932-933 (1988); Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Although a reasonable expectation of profit is not required, the taxpayer must have a bona fide objective of realizing a profit. "Profit" in this context means economic profit, independent of tax savings. Horn v. Commissioner, supra; Capek v. Commissioner, 86 T.C. 14, 36 (1986); *664 Beck v. Commissioner, 85 T.C. 557, 569 (1985). The determination of whether the requisite profit objective exists here is one of fact to be resolved on the basis of all the surrounding facts and circumstances. Greater weight is given to objective factors than to petitioners' statements of intent. Sec. 1.183-2(b), Income Tax Regs.; Thomas v. Commissioner, supra; Dreicer v. Commissioner, supra.
Similarly, a transaction will be disregarded if it is devoid of economic substance consonant with its intended tax effects. In James v. Commissioner, 87 T.C. 905, 918 (1986), we stated: The substance of the transaction, not its form, determines its tax consequences. The transaction must have economic substance which is "compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance -- features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. at 583-584; Estate of Thomas v. Commissioner, 84 T.C. 412 (1985); *665 Hilton v. Commissioner, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). Petitioners have the burden of proving that the activity had economic substance and, if so, the existence of an actual and honest profit objective. Rule 142(a). We find that petitioners have not satisfied their burden on either point. Economic Substance
Petitioners have failed to meet their burden of proving that the Goldfield ore purchasing program had economic substance. The profitability of the program was dependent entirely on the level of gold and silver contained in the St. Ives waste dump. [7] Based on levels of 1.87 troy ounces of gold and 13.20 troy ounces of silver per ton of ore, the promotional brochure estimated that a purchaser of 125 tons of ore for $ 50,000 would realize a profit of approximately $ 9,000. However, petitioners have failed to prove that these metal values were bona fide estimates that could realistically materialize. No evidence was presented which dealt specifically with the precious metal contents of the St. Ives waste *666 dump. Through John C. Rebenstorf III, president of Goldfield, petitioners introduced evidence that was purported to be results of some tests conducted by Willard A. Luegge, one of Goldfield's assayers. These results showed the precious metal content of ore delivered to Mr. Luegge by Goldfield. One set of tests was purportedly conducted in 1981 on ore from Goldfield's Combination Mine. These results, however, provide no assistance to us or petitioners. The ore being sold to petitioners and the other investors in the program came from the St. Ives waste dump, not from the Combination Mine. Moreover, these results provided no information on the procedures used in the testing or the expertise of the individuals conducting the testing. Numerous other tests were purportedly conducted by Mr. Luegge between 1974 and 1986. These results also provide no assistance to petitioners. They do not indicate where the tested ore came from (not even whether the ore came from any of Goldfield's properties) or the procedures used in the testing. *667 Petitioners also presented a report by Harold T. Allen on the metal values of ore in eight Goldfield waste dumps. However, like the other reports, the Allen report is not helpful to petitioners' case; in fact, it is very detrimental. Based on a market price of $ 410 per ounce of gold and $ 5.25 per ounce of silver, the report concluded that a composite assay of the eight waste dumps showed a recoverable value of $ 96.65 per ton. A comparison of this figure to the $ 400 per ton allegedly paid by petitioners suggests that Goldfield was not selling a realistic profit potential, but was instead selling tax benefits. Other indicia of lack of economic substance are the presence of deferred debt that is in substance or in fact not likely to be paid, and the failure to adhere to contractual terms. See Estate of Franklin v. Commissioner, 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Horn v. Commissioner, 90 T.C. at 938; Rose v. Commissioner, 88 T.C. 386, 410-411, 419-420 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Conversely, bona fide third party debt may indicate that a transaction, *668 or at least part of it, should be recognized. Rose v. Commissioner , supra.Indebtedness has been defined as "an unconditional and legally enforceable obligation for the payment of money." Autenreith v. Commissioner, 115 F.2d 856, 858 (3d Cir. 1940), affg. 41 B.T.A. 319 (1940); Knetsch v. United States, 364 U.S. 361 (1960). Although petitioners executed a note entitled "Full Recourse Secured Promissory Note," the facts presented here do not support that characterization. Substance, not form, must govern. Gregory v. Helvering, 293 U.S. 465 (1935); Waddell v. Commissioner, 86 T.C. 848, 902 (1986), affd. 841 F.2d 264 (9th Cir. 1988). We find that there was no bona fide obligation on petitioners to honor the note. The note was for one year with an option for a 10-year extension. The only collateral specifically securing the note was the 125 tons of ore. The note prescribed a fixed rate of interest payable quarterly, the first payment due three months from the date of the note, December 23, 1982. The note provided that Goldfield's wholly owned subsidiary, AAA-Financial *669 Corporation, was CCF's "authorized agent" to accept payment on the note, which, along with any interest and other charges due, was to be paid from the total metals produced. However, although the first interest payment on the note was due on March 23, 1983, petitioners have admitted that they have not made any payments on the note or have been asked to make any payments. Under these circumstances, it does not appear that petitioners had a legitimate obligation or incentive to repay the note or to pay the interest due on the note. See Estate of Franklin v. Commissioner, supra; see also Gibson Products Co. v. United States, 637 F.2d 1041 (5th Cir. 1981); Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Petitioners' justification for not honoring the written terms of the note was that they were concerned about the effect of the SEC action against Goldfield on their investment. We do not find this argument persuasive. The SEC did not commence its suit against Goldfield until April 1983, after the first interest payment was due. Moveover, if CCF was truly independent, it *670 is unlikely that petitioners would be excused from honoring the note held by CCF because of problems with Goldfield. We also doubt whether any amounts were in fact borrowed under the arrangement with CCF and Goldfield. Petitioners have not established that CCF paid any loan proceeds to Goldfield. The only evidence presented was on petitioners' $ 10,000 cash payment to Goldfield. Under these circumstances, we conclude that the note and security were illusory, used to artificially inflate petitioners' tax deductions. There are additional indicia that the program lacked economic substance. Goldfield did not have the capability to process ore in commercially marketable quantities. This was admitted by Rebenstorf and established by other evidence submitted by petitioners. According to a production report for the period January 1, 1982, to July 31, 1982, Goldfield processed a total of approximately 375 tons of ore which, at an annual rate, amounts to only approximately 650 tons. At this rate, it would take Goldfield more than 23 years to process the approximately 15,000 tons of ore purchased by investors. Rebenstorf testified that Goldfield was planning to increase its capability. *671 However, other than this self-serving testimony, no evidence was presented that this was in fact the case. We, therefore, conclude that the program lacked economic substance. Profit Objective
An independent investigation of the economic viability and profit potential of a transaction is an indication of profit objective. Rose v. Commissioner, 88 T.C. 386, 415-416 (1987), affd. 868 F.2d 851 (6th Cir. 1989); Horn v. Commissioner, supra at 934. Petitioners contend that their profit objective is evidenced by the fact that they did not rely solely on the promotional material furnished by Goldfield before investing in the program, but conducted a "reasonable investigation" and conferred with other professionals. We do not find this argument persuasive. Petitioners, although they had no experience or education in mining, did not consult with anyone independent of the program who was knowledgeable about mining or who was familiar with Goldfield. See Horn v. Commissioner, supra at 934-936; Beck v. Commissioner, supra at 571. *672 Their investigation consisted of talking with people who had a vested interest in the program or who knew nothing about mining or Goldfield. They talked to Doug Coleman, one of Goldfield's salesmen who received a commission for selling petitioners the 125 tons of ore. They talked to officials of Goldfield who, for obvious reasons, could not have had petitioners' interests in mind. They talked to a member of the law firm that prepared the tax opinion for the program. No evidence was presented that this individual knew anything about mining or the economic viability of the investment. Moreover, as disclosed by the tax opinion, anything this attorney "knew" regarding the program was not gained by independent observations, but was provided by Goldfield and its officials. The other individuals petitioners identified were consulted for their tax or financial expertise, not for their knowledge about Goldfield or the mining business. These individuals were accountants, financial officers and a financial planner who based any advice or opinions solely on Goldfield's promotional material. Petitioners, although they investigated the tax aspects of the program, made no effort to evaluate *673 the gold and silver content of the ore they purchased. Petitioner testified that he did not hire any independent experts to select the best 125 tons of ore available in the waste dump, but was willing to take any ore Goldfield was going to give him. This indicates that petitioners viewed the Goldfield program as a means to make money through tax avoidance, and if any income was realized from the investment, it would have been a purely unexpected benefit. We, therefore, cannot see how petitioners' investigation indicates that they possessed a profit objective for participating in the Goldfield program. In fact, their investigation was geared towards the tax benefits provided by the program. If petitioners had conducted a bona fide investigation for purposes of evaluating the profit potential of their investment, they would have discovered that the metal values disclosed in the brochure were, at the very least, questionable, and that the Goldfield mines were not operating, had not operated for some time and were not suitable for any mining operations. The mine shaft was in a state of disrepair; it was rusted; there were no cables to run the skips; and some of the supporting timbers *674 were broken. Moreover, as we discussed above, Goldfield's refining capabilities were not suitable for processing ore in commercial quantities. Petitioners' investigation was not only superficial, but any problems that were uncovered were ignored. Petitioner, a corporate attorney, discovered that the program violated various securities laws. However, despite this knowledge, he still participated in the program. This further suggests that petitioners were concerned exclusively with taking advantage of the immediate tax deduction offered by the program, and indifferent as to whether any profit would be realized in the future. [8]
Another indication of the absence of an actual and honest profit objective is the fact that the promotional material relied upon by petitioners was devoted extensively to the tax benefits an investor would realize from the Goldfield program. Rose v. Commissioner, supra at 412-413. The most prominent feature of the program *675 was the five-for-one tax write-off. The promotional brochure, in large bold letters on the very top of the first page, stated: TAX ADVANTAGED ORE PURCHASING PROGRAM BY GOLDFIELD DEEP MINES COMPANY OF NEVADA
Moreover, the same page promised the tax benefits from a "500% leveraged purchase," but only promised a "potential return on cash" invested. The brochure also included a section devoted to how the "TAX LAWS FAVOR THE MINING BUSINESS." The tax benefits of the program were also illustrated in a section of the brochure entitled "HOW THE ORE PURCHASING PROGRAM WORKS." That section concluded that an investor in the 50-percent tax bracket with $ 50,000 of income would save $ 25,000 in taxes in the first year with only a $ 10,000 cash payment. That section also recognized that the realization of economic profit was only a "potential." In this regard, although the brochure estimated a 91-percent return on the cash portion of an investment, the sample IRS Form 1040 Schedule C did not anticipate any income from mining. The Schedule C only reflected a $ 100,000 deduction for the purchase price of the ore, resulting in a $ 100,000 loss. In addition, the question and answer portion *676 of the brochure was almost exclusively devoted to the tax implications of the program. We, therefore, conclude that in recruiting potential investors, Goldfield focused on those who would be most interested in and concerned with the tax effects of the program, not on its economics; and petitioners gave us no genuine indication that they were any different. The effect of the Goldfield program on petitioners' personal tax situation is further evidence that they were in pursuit of tax benefits, not gold bullion. Excluding the $ 50,000 loss claimed from the Goldfield program, petitioners had taxable income in 1982 of approximately $ 50,000. Thus, after taking into account the mining loss, petitioners reported taxable income of $ 0, which resulted in a reported income tax liability for 1982 of $ 0. It is also not surprising that petitioners' income level was similar to that used in the brochure to illustrate how the tax benefits of the program could be fully utilized. We, therefore, conclude that petitioners lacked an actual and honest profit objective. Mine Development Expense or Capital Expense
In addition to the absence of economic substance in the transaction and *677 petitioners' lack of profit objective, there are other reasons the claimed deductions would fail. In order to be entitled to a deduction under either section 616(a) or 162(a), petitioners must prove the facts on which they base their claim to such deduction and must show that their expenditures fall within the terms of either statute. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). The parties agree that the costs of acquiring mineral ore is a nondeductible capital expense. However, the parties disagree on whether petitioners' investment consisted of such an acquisition. Petitioners contend that they invested $ 50,000 for mine development, site development, research, and mining. They argue that pursuant to section 1.616-1(a) and 1.616-1(b)(4), Income Tax Regs., a taxpayer need not incur these costs directly to be entitled to their deduction, but may engage a contractor for that purpose. To support their argument, petitioners focus on the program's offering circular which provides, in pertinent part, as follows: HOW THE ORE PURCHASING PROGRAM WORKS Example: *678 Buy 125 tons of mineral ore from the Company. Your ore will cost you a total of $ 400 per ton plus the royalty prevailing at time of settlement, plus refining cost of all metals extracted from your ore. The cost charged per ton is for mine development, mining, research and site development. In this regard, petitioner testified that it was his understanding "that my funds would be allocated [by Goldfield] to development expenses; and this was important to me because I realized that it would be necessary in order for this investment to be tax deductible." We agree with respondent and find that petitioners' investment was a capital expenditure incurred in the purchase of 125 tons of ore. Contrary to what petitioners claim, they did not pay or incur any expenses for the development of a mine, mining, research or site development. The parties did not enter into any agreement to that effect. However, the purchase agreement, which should be the best evidence of what petitioners were paying for, characterized the transaction as the purchase and sale of ore. The agreement provides that "the BUYER [petitioner] desires to immediately purchase 125 tons of mineral ore * * * from said *679 SELLER [Goldfield] and the SELLER agrees to sell said ore * * *." The agreement further states that "The SELLER will now sell said ORE to BUYER and BUYER shall now pay the sum of $ 50,000 upon signing this agreement, and the BUYER shall further pay, as of the balance of the purchase price, royalty of 25% of the total metals extracted." This is further evidenced by the promotional brochure which identified the program as an ore purchasing program and continuously characterized the investment as the purchase of 125 tons of ore. The program was entitled the "TAX ADVANTAGED ORE PURCHASING PROGRAM BY GOLDFIELD DEEP MINES COMPANY OF NEVADA" and the first sentence of the brochure stated that "Purchasers are being offered the opportunity to purchase mineral ore on a tonnage basis." (Emphasis added.) Petitioners are correct that a taxpayer need not incur the development costs directly to be entitled to deduct them under section 616. He may engage a contractor to make the development expenditures. Secs. 1.616-1(a) and (b)(4), Income Tax Regs. However, that is not the case here. Petitioners did not enter into any contract with Goldfield to develop the Goldfield mines or develop *680 any other mineral deposit located on Goldfield property. Moreover, no part of the purchase agreement made any provision for the development of any mines. Goldfield's only obligation under the purchase agreement was to provide petitioners with 125 tons of ore. There was no requirement that Goldfield spend any amounts of money for mine development, mining, research or site development. This is also supported by the testimony of John C. Rebenstorf. During his examination concerning whether petitioners acquired anything other than 125 tons of ore with their $ 50,000 investment, the following exchange took place: Q[Respondent's attorney] All right. The contract says that [the purchaser] desires to purchase 125 tons of mineral ore and the price is the sum of $ 50,000. A[Mr. Rebenstorf] Yes. Q Now, is he getting something besides 125 tons of mineral ore? A He's not going to get anything besides what he's [paying] for, or what the company wants to give him. If petitioners are implying that they should be able to deduct any mine development expenditures incurred by Goldfield but passed on to petitioners and reflected in the ore's $ 50,000 purchase price, they are mistaken. *681 Section 1.616-1(b)(4), Income Tax Regs., provides: The provisions of section 616 do not apply to costs of development paid or incurred by a prior owner which are reflected in the amount which the taxpayer paid or incurred to acquire the property. Such provisions apply only to costs paid or incurred by the taxpayer for development undertaken directly or through contract by the taxpayer. * * * We also conclude that any mine development expenses incurred or paid by Goldfield with proceeds of the ore sales would not be deductible by petitioners or the other investors under section 616. We have concluded that petitioners' investment was for the purchase of mineral ore only. If Goldfield incurred expenses qualifying under 616 in order to satisfy its sales contract with petitioners, it alone would be entitled to the deductions. However, the Goldfield mines were so neglected and in such disrepair that it is unlikely that Goldfield made any expenditures for mine development after petitioners invested in the program. Moreover, petitioners presented no evidence *682 that Goldfield made any expenditures for mine development, mining, research or site development. Unless they owned an interest in Goldfield or contracted with Goldfield to develop their interest in a mine or other mineral deposit -- neither of which is the case here -- petitioners could not vicariously share in any of Goldfield's ensuing tax benefits. Anderson v. Commissioner, 83 T.C. 898, 908 (1984), affd. without published opinion 846 F.2d 76 (10th Cir. 1988). Therefore, we conclude that because petitioners purchased mineral ore only, they are not entitled to a deduction under either sections 616 or 162. At-Risk Issue
For the same reasons we find the $ 40,000 note illusory, we find that petitioners have failed to establish that they were "at-risk" for the $ 40,000 they purportedly borrowed from CCF. Section 465 limits losses to the amount a taxpayer has at-risk in an activity. Sec. 465(a). An individual is at-risk for borrowed amounts only to the extent he is personally liable for such amounts or has pledged property, other than that used in the activity, as security for the borrowed amount. Sec. 465(b)(2). Not only were petitioners *683 not at-risk for the borrowed amounts, we doubt whether there were any amounts borrowed. The Danville Program
Respondent, in the notice of deficiency, disallowed all of the 1982 deductions attributable to Danville, as was reported by petitioners in their amended return. Respondent explained that the adjustment was made "in accordance with the partnership return, which has also been examined." Petitioners contend that their amended return reflected the adjustments made on Danville's partnership return, as was agreed to in the December 11, 1984, closing agreement, and any further adjustment would violate the agreement. The parties do not dispute that the closing agreement is binding here. The dispute is whether respondent correctly applied the terms of the agreement when he disallowed the deductions attributable to Danville as reported on petitioners' amended return. Therefore, the issue we must address is whether respondent has complied with the closing agreement. Section 7121(a) authorizes respondent to enter into agreements in writing with any person relating to the liability of *684 such person or of the person for whom he acts in respect to any internal revenue tax for any taxable period. Closing agreements are binding on the parties as to the matters agreed upon and may not be annulled, modified, set aside or disregarded in any suit or proceeding unless there is a showing of fraud, malfeasance or misrepresentation of a material fact. Sec. 7121(b); Wolverine Petroleum Corp. v. Commissioner, 75 F.2d 593 (8th Cir. 1935), affg. 29 B.T.A. 1236 (1934); Zaentz v. Commissioner, 90 T.C. 753, 760 (1988); Estate of Johnson v. Commissioner, 88 T.C. 225 (1987), affd. without published opinion 838 F.2d 1202 (2d Cir. 1987). Respondent's determination is presumed correct and the burden is on petitioners to prove that the disallowance of the Danville deduction was erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioners have failed to present any evidence to assist us in determining the extent to which the deductions were compromised by the parties. In fact, neither side has made an effort to assist us in deciding this issue. The parties did not introduce *685 the amended partnership return or any other evidence indicating the amount of deductions, if any, allowed under the compromise agreement. In the absence of this evidence, respondent's determination must be sustained. The Additions to Tax
Section 6653(a)
Section 6653(a)(1) provides that, if any part of any underpayment of tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a)(2) provides that if any part of an underpayment of tax is due to negligence or intentional disregard of the rules and regulations, there shall be added to the tax, in addition to the 5-percent addition provided in section 6653(a)(1), an amount equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence. Under section 6653(a), negligence has been defined as the lack of due care or failure to do what a reasonable *686 and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners contend that they were not negligent because they undertook a reasonable investigation of the Goldfield program. We have found that petitioners did not conduct a reasonable investigation. Petitioners failed to consult with anyone independent of Goldfield who had any knowledge of mining or mineral ore. We believe that the persons petitioners consulted with would not have been relied upon by a reasonable person in making a business decision. Those persons were either affiliated with Goldfield or not knowledgeable about mining. Moreover, petitioners made no attempt to verify, through independent sources, any of the information contained in the promotional brochure. Petitioners' negligence is further evidenced by the fact they invested in the program even after discovering that the program violated various securities laws. Therefore, we find that petitioners are liable for the additions to tax under section 6653(a)(1) and (2); however, to reflect the closing agreement, the section 6653(a)(2) addition must be reduced to the extent the underpayment *687 is attributable to the Danville program. Section 6661
Respondent also determined an addition to tax under section 6661, which imposes an addition to tax if there is a substantial understatement of income tax. An understatement is substantial when the understatement exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on the return. The amount of the addition to tax under section 6661(a) is equal to 25 percent of any underpayment attributable to the substantial understatement. Respondent, in the notice of deficiency, determined the addition based on the rate as it then existed, 10 percent of the underpayment. By an amended answer, respondent increased the addition to 25 percent of the underpayment as allowed by section 8002 of the Omnibus Budget Reconciliation Act of 1986, effective for additions assessed after October 21, 1986. See Pallottini v. Commissioner, 90 T.C. 498 (1988). Because petitioners have not shown that the understatement was due to an item for which there was "substantial authority" or that "the relevant facts *688 affecting the item's tax treatment [were] adequately disclosed in [their] return," the section 6661(a) addition will apply at the 25-percent rate to the underpayment attributable to petitioners' participation in the Goldfield program, but pursuant to the closing agreement, not to petitioners' participation in the Danville program. However, our conclusion of whether the understatement is substantial is conditioned upon the results of the Rule 155 computation. Section 6621(c)
The final issue is the additional interest imposed on tax motivated transactions by section 6621(c). [9] The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax motivated transaction includes any loss disallowed by reason of section 465(a) and any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(ii), (v). We have defined sham or fraudulent transaction to include transactions which were without economic substance. Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway s v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), *689 affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). In addition, the Secretary has the authority to specify types of transactions that will be treated as tax motivated. Sec. 6621(c)(3)(B). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included as tax motivated transactions in the temporary regulations. Sec. 301.6621-2T Q-4, Proced. and Admin. Regs. (Temporary), 49 Fed. Reg. 50390 (Dec. 28 1984). We have previously disallowed the deductions related to the Goldfield program because the transaction lacked economic substance, and petitioners lacked the requisite profit objective. Thus, the increased rate of interest under section 6121(c) applies to the underpayment attributable to the Goldfield program. Horn v. Commissioner, supra at 944-945. *690 To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code, as amended and in effect for the year at issue. All rule references are to the Tax Court's Rules of Practice and Procedure. ↩
2. The words "investment" and "investor" are being used herein for simplicity. We do not intend to imply by their use any conclusion as to the character of the transactions at issue under Federal tax law. ↩
3. The word "ore" is being used herein for simplicity. We do not imply by its use any conclusion as to the metal content of the earth or rock that was the subject of the Goldfield program.↩
4. Petitioners presented John C. Rebenstorf III, president of Goldfield, as a mining expert. However, we only allowed Mr. Rebenstorf to testify as a fact witness.↩
5. Although not the basis of our findings, Rhoads testified, orally and through his report, that as a result of his investigation, he found that the Goldfield mining district was mined for gold and silver in the late 1800's and early 1900's. Most of the precious metal values in the district were produced by one or two mines. Rhoads reviewed "Professional Paper 66" of the United States Geological Survey series and found that the St. Ives Mine, Goldfield's "flagship" mine during the program at issue, was a relatively small producer with less than $ 100,000 in gold values to its credit by 1900. By 1914, the St. Ives was being used only to access adjacent claims. After 1914, no mining activity was conducted at the St. Ives Mine. From 1920 to 1945, there was no production from any of Goldfield's mining claims, including the St. Ives claim. Between 1945 and 1961, Goldfield conducted some mining activity, but it was in conjunction with the Newmont Mining Company. However, Newmont's interest and efforts were concentrated on the Florence Mine, not the St. Ives. Newmont subsequently acquired most of Goldfield's mining claim, with the exception of the St. Ives claim and some others. In 1961, Orin Swain took control of Goldfield; since then there has not been any mining activity on the mining claims owned by Goldfield. Goldfield has been paying its Nevada mining tax based on its status as a "non-producer." Rhoads also compared the mineral values claimed in Goldfield's promotional material with available historical data. Rhoads found that in the early 1900's when the waste dumps were created, mines in the area, including one of the mines owned by Goldfield, were profitably mining ore containing approximately .4 ounces of gold per ton. Based on this analysis, Rhoads concluded that Goldfield's estimates that the waste dumps contained 1.87 ounces of gold per ton were unrealistic. Rhoads reasoned that because the waste dumps were by-products of mining from the late 1800's and early 1900's, no prudent mine operator at that time would have abandoned the ore in the waste dumps if it contained anything near 1.87 ounces of gold per ton. Rhoads also concluded that because the ore in the Goldfield district, on average, contained .4 ounces of gold per ton, it was likely that the waste dumps created from this mining activity had, at best, the same gold content. Rhoads, during his investigation of the St. Ives Waste Dump, also reviewed two earlier reports prepared by Shiells Metallurgical Lab and William O. Karvinen, a geological consultant. The Shiells report was prepared in 1983 for the receiver of Goldfield; the Karvinen report was prepared in 1981 for an individual who appears to have been a prospective investor in Goldfield. A copy of the Karvinen report was also apparently forwarded to Goldfield in December 1981. After an examination of several samples of ore, the Shiells report concluded that the St. Ives dump contained approximately .051 ounces of gold per ton and .28 ounces of silver per ton. Based on the prevailing price for gold and silver at that time, $ 420 per ounce of gold and $ 11.75 per ounce of silver, the value of precious metal in each ton was calculated at $ 24.71. The Shiells report reduced the value by 25 percent, estimating that only approximately 75 percent of the precious metal can actually be extracted from the ore. The Karvinen report contained similar findings. It concluded that the St. Ives dump averaged approximately .04 ounces of gold per ton and .28 ounces of silver per ton, with no platinum or palladium detected. The report further concluded that: There is also a dire lack of expertise in geology, mining and metallurgy in the groups promoting these ventures. Because of the lack of economic quantities of metals in the primary material and the amateur approach to milling and processing, there is little chance that either will be a profitable undertaking. Thus investment into these ventures is not recommended.↩
6. A waste dump is rock and earth that had no economic value when mined and was mined to facilitate the extraction of economic ore.↩
7. Petitioners contend that the ore they purchased was a combination of ore located in the waste dump and unmined ore in the Goldfield mines. Although this is not a critical point in our analysis, we find that the ore being purchased by investors, including petitioners, was contained solely in the St. Ives waste dump. This has been established by the admissions made to Rhoads by Orin Swain and Allen Harter and by the fact that the Goldfield mines were not operating at the time the program was being promoted, had not operated in some time, and were in such disrepair that it was unlikely they were intended to be operated in the future. Moreover, there was enough ore in the waste dump that it would be unreasonable to assume that Goldfield would needlessly incur the substantial expense of extracting ore from a mine.↩
8. Petitioners also argue that their failure to realize a profit was caused by the SEC suit against Goldfield. However, petitioners' own investigation revealed that Goldfield's program violated securities laws.↩
9. Prior to the Tax Reform Act of 1986, subsec. (c) was designated subsec. (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies to periods beginning after Dec. 31, 1984, notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005↩ (2d Cir. 1986).